[No. G019631. Fourth Dist., Div. Three. Feb. 21, 1997.]

GUY R. TORELLI, Plaintiff and Appellant, v.
J. P. ENTERPRISES, INC., Defendant and Respondent.

---

**COUNSEL**

Wildish & Nialis and Daniel R. Wildish for Plaintiff and Appellant.

Albrecht & Albrecht and W. E. Jon Albrecht for Defendant and Respondent.

---

**OPINION**

**SILLS, P. J.—**

### INTRODUCTION

A real estate broker had a listing agreement to sell certain commercial property, but that agreement expired. A month later the broker found a buyer for the property. The broker presented to the seller a standard form real estate purchase contract signed by the buyer, which called for the broker to be paid a 2.5 percent commission. The seller signed a counteroffer, which, with several exceptions not relevant to this appeal, accepted the terms of the offer set out in the purchase contract, including the commission arrangement. The counteroffer was set to expire in just a few days.

The counteroffer was not accepted before the expiration date. After the expiration the parties began negotiating on their own and soon came to an agreement. Understandably miffed, the broker sued to recover his commission. The seller requested summary judgment, claiming that expiration of the counteroffer ended any obligation to pay the broker a commission. The trial court agreed, and granted the motion.

The trial court erred. The promise to pay *the broker* a commission did not die with the expiration of the counteroffer *to the buyer*. When the seller signed the counteroffer, it became bound by an implied promise not to deprive the broker of the benefits of the bargain to pay the commission. The law does not allow a broker to be cheated out of his or her commission by the simple artifice of entering into direct negotiations and making substantially the same bargain, albeit without the commission. Accordingly, we reverse the judgment.

## FACTS

In January 1995 Carolyn Melstrom met Guy R. Torelli while viewing a property for sale. Melstrom, a licensed real estate agent herself, was looking for "residential income property" to buy for her and her elderly mother. As the property viewed was not suitable, Torelli suggested they visit a property owned by J. P. Enterprises, Inc. that might still be available. Torelli had been the exclusive listing agent for this property during summer and fall of 1994.

As the fates would have it, Melstrom was interested. Torelli assisted Melstrom in preparing an offer on the property for $1,375,000. The document included a 5 percent commission, to be split between Torelli and the O'Brien Company, the buyer's broker. The language governing the commission arrangement was: "Seller agrees to pay compensation for services as follows: [¶] 2 1/2 % of price, to Torelli Investment Realty, Broker, and [¶] 2 1/2% of price, to O'Brien Company, Broker, [¶] payable (a) on recordation of the deed or other evidence of title . . . ."

Torelli faxed the offer, denominated real estate purchase contract and receipt for deposit, to Jon Albrecht of J. P. Enterprises, the owner of the property on January 30, 1995. About the same time, Torelli also spoke by phone with Albrecht, who (at least according to Torelli's declaration) orally agreed to pay Torelli a commission on the transaction.

On late February 1, Torelli received a written counteroffer from J. P. Enterprises. The counteroffer was for about $1,430,000, but, with a few exceptions, accepted the terms of the offer, including the commission arrangement. Section A3 of the counteroffer provided that it would be "deemed revoked" unless a signed acceptance was personally received by 6 p.m., February 3, 1995. The counteroffer was not accepted before the expiration date.

For some reason, Torelli had lost the confidence of the Melstroms by February 3, who, on that date, sent Jon Albrecht a letter, suggesting direct negotiations because Torelli "ha[d] been less than forthright" with the Melstroms.

Afterwards, O'Brien drafted an offer from the Melstroms, which J. P. Enterprises accepted on February 16. After discovering the sale was conducted without him, Torelli filed a complaint for breach of written contract and three tort actions for intentional interference with a contract.[1]

J. P. Enterprises requested summary judgment, asserting that any contract between it and Torelli expired with the nonacceptance of the

[1]No cause of action for unjust enrichment or quantum meruit was included.

counteroffer. In his opposition to the summary judgment motion, Torelli declared that the property was sold "for an amount of money equal to the price set forth on the counteroffer, less the $35,000 commission."

The trial court agreed with J. P. Enterprises. Judgment was entered that Torelli take nothing. Torelli then filed this appeal.

### DISCUSSION

Brokers typically protect their right to a commission by obtaining from their clients listing agreements which specifically delineate the rights and duties of the parties. (See Civ. Code, § 1086, subd. (f) [explanation of various types of listing agreements in California]; 1 Miller & Starr, Cal. Real Estate (2d ed. 1989) § 2:2, p. 514 ["The listing can contain any terms and conditions that may be agreed upon by the parties . . . ."].)

The absence of a listing agreement does not, however, deprive a broker of his or her commission. Rather, the right to the commission then depends on the document which *does* set forth the commission agreement, sometimes the real estate sale contract itself, sometimes the escrow instructions. Thus Miller and Starr, in their treatise, write: "The broker's right to recover a commission is markedly different when he does not have a listing agreement with the owner. . . . [W]hen the broker does not have the advantage of a prior listing agreement, he must rely *solely* upon the contract between the buyer and seller, or some other written promise to pay compensation, for the recovery of his commission." (Miller & Starr, *supra*, § 2:33, p. 633, fns. omitted.) Elsewhere, Miller and Starr reiterate the point: "Where the broker does not have a listing contract, he must rely upon the promise to pay a commission contained in the contract between the parties, and where this agreement is the only written document providing for the payment of the commission, he is subject to the terms and conditions of payment contained in the agreement." (*Id.* at p. 635.)

It is, however, an error to slide from the idea that a broker's right to a commission depends on an agreement the function of which is to serve as a contract between two other parties—the buyer and seller—to the idea that the broker's right to a commission necessarily may be defeated if the buyer and seller do not sign the precise piece of paper *embodying* that agreement. As far as the broker's right to a commission is concerned, the broker-seller contract set forth in a counteroffer must be distinguished from the seller-buyer contract which *would* be formed *if* the buyer signed the counteroffer. Any other rule would lead to a gross inequity where the buyer did not sign the particular piece of paper setting forth the counteroffer, but nevertheless

bought the property on substantially the same terms as set forth in the counteroffer.

The cases which articulate the rule that without a listing agreement a broker's commission rises and falls with the contract between buyer and seller, involve situations where there was no sale between the buyer and seller, and the deal fell through *without fault* on the part of the seller. (E.g., *City of Turlock* v. *Paul M. Zagaris, Inc.* (1989) 209 Cal.App.3d 189, 192-194 [256 Cal.Rptr. 902] [because eminent domain proceedings prevented sale, and because broker's right to commission depended on escrow closing, broker had no right to commission as part of condemnation award]; *Paulsen* v. *Leadbetter* (1968) 267 Cal.App.2d 148, 150 [72 Cal.Rptr. 819] [broker could not recover where there was no evidence that failure of the escrow to close "was the result of either party's wilful default"]; *Chapman* v. *Gilmore* (1963) 221 Cal.App.2d 506, 508-509 [34 Cal.Rptr. 515] [no recovery from seller by broker where *buyer* repudiated contract]; *Ira Garson Realty Co.* v. *Brown* (1960) 180 Cal.App.2d 615, 624-625 [4 Cal.Rptr. 734] [no recovery where buyer backed out of deal].) As *Chapman* points out, the result in such cases is equitable because the seller "received no benefit from the broker's services." (*Chapman, supra,* 221 Cal.App.2d at p. 508.)

On the other hand, the case law is also clear that where the seller, i.e., the party with whom the broker has the agreement to be paid a commission, is the *cause* of the loss of the sale, the broker *can* recover. In such an instance the seller *has* received the benefit of the broker's service. In *Collins* v. *Vickter Manor, Inc.* (1957) 47 Cal.2d 875 [306 P.2d 783], for example, a corporation orally agreed with a group of brokers to sell certain property, and the brokers' right to a commission was memorialized in a deposit receipt signed by both seller and buyer. The deal fell through, however, when the sellers refused to furnish a soils report. Even though the deal was not consummated, the Supreme Court held that the brokers could still recover their commission: "Even if we assume that the agreement between plaintiff brokers and defendant corporation can properly be construed to mean that plaintiffs were not to receive their commission until consummation of a final agreement between the corporation and the buyer, the judgment appealed from cannot be affirmed. . . . [W]e must infer that plaintiffs and the buyer did everything which the agreement required of them and that consummation was prevented solely by the arbitrary refusal of defendant corporation and its officers to proceed with the transaction. In these circumstances, the defendants will not be allowed to take advantage of their own remissness to defeat plaintiff's recovery." (*Id.* at p. 881.)

Another Supreme Court case in the same vein is *Coulter* v. *Howard* (1927) 203 Cal. 17 [262 P. 751], where the only writing evidencing the right to a

commission was in certain escrow instructions signed by the seller. The seller later repudiated the transaction because she wanted to sell the property to another. "Respondent next asserts that conceding the writing signed by her to be sufficient under the law, nevertheless the sum was not to be paid until the close of the escrow and then only out of funds payable to her thereunder. This would undoubtedly be true if she were free from fault in the premises [citations]. But prior to the time provided for completion of the transaction, respondent not only sold the property to another . . . but she actually served notice of the attempted cancellation of the whole transaction. The law will not lend an ear to such contention on her part; therefore, the payments provided will be held due as of the date of the repudiation. The law requires of the vendor good faith and the doing of no intentional act to discourage, embarrass, or prevent the completion of the purchase." (*Id.* at p. 23.)

Similar sentiments are found in *Chapman* v. *Gilmore, supra*, 221 Cal.App.2d at page 510 (dicta that recovery "could be had" if there had been an allegation that the seller had arbitrarily refused to consummate the sale despite having a ready, able and willing buyer); *Paulsen* v. *Leadbetter, supra*, 267 Cal.App.2d at page 153 (repeating *Chapman*'s dicta); and in *Lawrence Block Co.* v. *England* (1962) 211 Cal.App.2d 318 [27 Cal.Rptr. 362] (broker could recover where completion of sale was prevented by seller's refusal to provide for a termite inspection).

If, under *Collins* and *Coulter*, a broker may recover when a sale is not consummated due to the seller's fault, it naturally follows that a broker may recover when a sale *is* consummated because the buyer and seller, having been brought together by the broker, entered into direct negotiations. Indeed, in bare outline at least, it is hard to imagine a more blatant example of an attempt to cheat a broker out of a commission than the case before us. For purposes of the summary judgment motion the salient facts were: Torelli procured a buyer who made an offer; the seller then agreed, in a counteroffer, to pay Torelli a commission; and the buyer eventually bought the property on substantially the same terms as set out in the counteroffer, albeit not pursuant to the precise document which embodied the counteroffer. The bottom line is that J. P. Enterprises received the primary benefit of any broker's services—the finding of a buyer—but did not pay for it.

To read the counteroffer as limiting Torelli's right to a commission to situations where that particular document was signed by the prospective buyer would be directly counter to *Collins* and *Coulter* because the broker could not, in such instances, recover even when the seller unilaterally pulled out. It would also be contrary to the plain language of the counteroffer

(incorporated from the offer), which contemplated that Torelli's right to a commission would be payable "on recordation of the deed"—not acceptance of the counteroffer.

True, it appears that the direct negotiations in this case were instigated by the buyer, so that, strictly speaking, it cannot be said that the reason the counteroffer *qua* counteroffer[2] was not signed by the buyer prior to its expiration date was the "fault" of the seller. But just because the seller was not at fault for the nonacceptance of the counteroffer does not mean the seller could, with impunity, breach its *existing* contract to pay a commission to the broker. As adumbrated in *Coulter*, and made express many times thereafter, every contract has an implied covenant not to do anything which injures the right of the other party to receive the benefits of the agreement. (E.g., *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 658 [328 P.2d 198, 68 A.L.R.2d 883].) Having made an agreement to pay Torelli a commission which was memorialized in the counteroffer, J. P. Enterprises could not thereafter, consistent with the implied covenant of good faith, make a deal with the buyer on substantially the same terms as it contemplated in the counteroffer without paying Torelli the agreed commission.[3] The omission of a provision for Torelli's commission in the final agreement was the functional equivalent of a with-fault repudiation of the entire sale. While no writing may have expressly prohibited J. P. Enterprises from entering into direct negotiations with the Melstroms, the implied covenant of good faith meant that J. P. Enterprises still had no right to use those negotiations to deprive Torelli of his commission for having found the Melstroms in the first place.

It was thus error to grant the summary judgment on the basis of the expiration of the counteroffer. The judgment is reversed. Torelli is to recover his costs on appeal.

Wallin, J., and Rylaarsdam, J., concurred.

A petition for a rehearing was denied March 12, 1997, and respondent's petition for review by the Supreme Court was denied May 14, 1997.

---

[2] As distinct from the counteroffer *qua* commission agreement.

[3] We express no opinion on the question of whether a subsequent agreement between buyer and seller on substantially different terms than originally proposed in the counteroffer would alter the result.