[No. H026145. Sixth Dist. Apr. 25, 2005.]

RICHARD W. SULLIVAN, as Trustee, etc., et al., Plaintiffs and Appellants,
v.
DEAN DORSA, as Cotrustee, etc., et al., Defendants and Appellants;
ROBERT H. ENGLES, as Referee, etc., et al., Movants and Respondents.

948

### COUNSEL

Kathleen O'Reilly and David R. Sylva for Plaintiffs and Appellants.

Kathleen O'Reilly and David R. Sylva for Defendant and Appellants.

Silicon Valley Law Group and Gregory John Charles for Movants and Respondent Silicon Valley Law Group.

Haight, Brown & Bonesteel and Jules Solomon Zeman for Movants and Respondent Grubb & Ellis Company.

### OPINION

**RUSHING, P. J.**—The primary question presented by this appeal is whether a court presiding over an action to partition real property has the power to award a brokerage commission on an unconsummated sale of the property. We have concluded that such an award is precluded by provisions of the Probate Code expressly made applicable to partition actions. We therefore reverse an order allowing a commission on a sale that was neither confirmed nor consummated. We affirm orders allowing fees to the erstwhile attorneys for the partition referee.

### BACKGROUND

This proceeding concerns approximately 16 acres of land on Highway 101 in Morgan Hill known as the Cochran Road Ranch. Members of the Sullivan and Dorsa/Benassi families apparently purchased this property in 1967. It is now held in undivided interests by their descendants and successors, including several trustees for family trusts (the owners).

In 1997, the owners sold a nearby parcel for $10.50 per square foot. In December 1999, some but not all of the owners agreed to sell the present parcel to AG Industries for $10 per square foot. They apparently also agreed that if fewer than all owners joined in the sale, those who had agreed to do so would institute partition proceedings to bring about a judicial sale. Some of the owners indeed declined to join in the sale, apparently in the belief that the property could bring a higher price.

Accordingly, in March 2000, owners Richard W. Sullivan, Patricia Hastings, Joan Sullivan, Joan Lundell, and June Gould, most of whom were acting as trustees, instituted this action by filing a complaint to partition the property by sale. On July 25, 2000, all owners agreed through their attorneys that a referee should be appointed. They received applications from several candidates, including Robert H. Engles, who identified himself as a senior vice president of Grubb & Ellis Company (Grubb), a real estate agency. He stated in his application that he would charge nothing for his services as referee, but if engaged as listing and marketing agent for the property would charge a commission of "4 [percent] of sale price split 50/50 between listing side and selling side." Other respondents proposed commissions ranging from 3 percent to 6 percent.

In November 2000, the owners stipulated to entry of, and the court entered, an interlocutory judgment directing partition of the property by sale. The order appointed Engles as referee "with authority to sell the property at public auction to the highest bidder for cash, except as maybe [*sic*] otherwise provided by Sections 873.600–893.690 [*sic*] of the Code of Civil Procedure . . . . [¶] . . . Each bid or offer to purchase the property shall be accompanied by a minimum of ten percent (10%) of the amount of the offer or bid . . . in the form of cash, money order or certified check." The court, per Judge Gregory H. Ward, entered the stipulated judgment.

On February 13, 2001, referee Engles filed an ex parte application for approval to hire Grubb as broker in marketing the property. In the motion Engles reiterated that in the event he received a commission for the sale of the property, he would "waive his referee fees in this action." The application was accompanied by a form "Exclusive Authorization of Sale" (listing agreement) granting Grubb "the exclusive right to negotiate the sale of the real property . . . for a period commencing on <u>December 6, 2000,</u> and ending at midnight on <u>To be determined</u> . . . ."[1] It called for a sale "to the highest bidder as determined by court order," and provided that the owner would be liable for a commission if, during the listing period, (1) the property was sold,

---

[1] Underlining denotes material that was inserted in blank spaces in the original form.

(2) the broker or any other person procured a buyer "who is ready, willing and able to purchase the Property or any interest therein on the terms above stated or other terms acceptable to the owner," (3) the owner contracted to sell the property, or (4) the owner terminated the listing agreement, withdrew the property from the market, or otherwise rendered it unmarketable. The agreement bore the signatures of Engles as "Receiver" and Bryan H. Freeman on behalf of Grubb. The court granted the motion.

Also on February 13, 2001, Engles moved ex parte for authority to hire Attorney Frank Maiorana of Silicon Valley Law Group (SVLG) to draft documents in connection with the sale of the property and to represent Engles in this proceeding. The court granted the motion.

It appears that around this same time, i.e., February 2001, Engles received four offers to purchase the property, including a renewal of the AG Industries offer of $10.00 per foot. The other three offers ranged from $11.21 to $12.00 per foot. Engles reportedly accepted the AG Industries offer, but the latter apparently allowed the contract to expire according to its terms.

On September 11, 2002, Engles executed a contract, as referee, to sell the property to JP DiNapoli Companies, Inc. (DiNapoli) for $6.75 per square foot, or $4,869,136.80.[2] It called for DiNapoli to tender a $100,000 deposit within two days of September 11, 2002, the "Agreement Date," but allowed a 120-day "Conditions Period," commencing with court confirmation of the sale, in which DiNapoli could conduct a feasibility study and could recover the entire $100,000 deposit if it chose to terminate the agreement. If it chose not to terminate the contract by the end of that period (the Approval Date), $50,000 of the deposit would become nonrefundable—subject to certain other conditions—and DiNapoli would deposit an additional $200,000. A further $50,000 would become nonrefundable 30 days later. The transaction was to close within 30 days after the Approval Date, but that date could be extended, for purposes of obtaining certain regulatory approvals, to as late as 12 months after the contract was approved by the court. DiNapoli could

---

[2] Engles explained the rather dramatic price reduction by stating that when the earlier contract with AG Industries had been negotiated (i.e., in or before 1999), the market had been "react[ing] to the Bay Area 'dot com' mania," and to an expectation of major new commercial developments near the property here. As of late 2002, he wrote, "These conditions no longer exist, and the real estate market in the Silicon Valley, particularly in Morgan Hill, is severely depressed. Given the state of the market, there are few comparable transactions. The available comparable sales indicate values in the $6.00–$7.00 per square foot range." He noted that he had recently received three other "serious offers," two with ostensibly higher prices, but opined that all were inferior to the DiNapoli offer for reasons stated.

extend the closing date another 60 days by depositing an additional $100,000.[3] It thus appears that closing could appear as late as 15 months after the court confirmed the sale. In addition, closing was subject to certain conditions including the obtaining of regulatory approvals, and the occurrence of certain other regulatory conditions could have the effect of terminating the agreement and permitting DiNapoli to recover its entire deposit.

The agreement identified Grubb as "Broker" and provided that "[a]t Closing, and only if Closing actually occurs, Seller shall pay to the Broker a brokerage commission, the amount of which shall be as specified in a separate agreement between Seller and Broker."

On September 13, 2002, Engles filed an application to engage a member of the Law Firm of Berliner Cohen (Berliner) as special counsel to help prepare sales documents on the ground that SVLG had a conflict of interest in the matter due to an "ongoing relationship" with the proposed buyer, i.e., DiNapoli. The court granted the application.

On October 15, 2002, Engles filed a "Referee's Return and Report of Sale of Real Property by Private Sale," along with a motion to confirm the sale. The report described the sale as subject to, among other things, the payment by the owners of a 4 percent commission to Grubb, there being no other brokers involved in the transaction. The report again indicated that Engles would waive any claim for referee's fees if the brokerage commission were paid. It also indicated that compensation would be sought for the two law firms that had represented Engles.

Several owners objected to confirmation on the ground that the proposed sale failed to conform to a written (but undated) stipulation in which all owners had agreed "that the sale of the subject property shall be had . . . in accordance with" specified procedures and terms, including that "the sale shall be for all cash," and that "no offer shall be accepted or be confirmed for less than $10.00 per square foot except pursuant to the express written agreement of all the owners." In addition, three owners objected on grounds,

---

[3] Although the agreement is complex and we have no occasion to arrive at a definitive construction, we see no basis in the contract for the referee's statement that closing was required to occur by September 11, 2003 (the anniversary of the Agreement Date), subject only to a further 60-day extension upon the making of a further deposit. Instead the contract seems to provide that closing must occur within 30 days after the Approval Date with an additional 60-day extension upon further deposit. The Approval Date in turn could be delayed for up to one year *after court approval* while the buyer pursued certain regulatory approvals. If such a reading were upheld, an order confirming the sale on December 5, 2002, would have permitted a closing as late as March 2004.

among others, that the purchase price was unacceptable, the sale was contingent on government approval of entitlements sought by the purchaser in conjunction with other property,[4] and the agreement allowed an unacceptably lengthy delay before closing.[5]

Judge Ward heard the motion to confirm the sale on December 5, 2002. Counsel for Engles argued that the owners' opposition was simply a matter of seller's remorse, that Engles had "done what the parties . . . asked him to do," and that "[s]ubstantial time" had been expended by Engles, DiNapoli, and DiNapoli's attorneys. The court noted that Engles was "entitled to his fees as referee for the time he put in" and "m[ight] have a cause of action against the parties if they fail[] to pay him a commission for this transaction." Counsel for some of the owners expressed her clients' willingness to "pay their fair share of . . . whatever the Court finds the fair fees for Mr. Eng[les] and his attorney are." Possibly addressing Engles or his attorneys, the court said, "You may want to talk to counsel [i.e., for the owners] about any potential liability that their clients may have for commissions on account of this deal. Because . . . this deal looks like an acceptable deal to me based on what I've seen in these papers. I haven't seen opposition which really attacks the referee's position that this is a reasonable offer and the best offer that can be obtained at this time. And everything I've read in the referee's report makes me believe that that is the case."

However, the court apparently viewed itself as powerless to confirm the sale in light of the owners' stipulation specifying terms at variance with those proposed. He apparently reasoned that the owners possessed the power to effectively veto the sale because the interlocutory judgment expressly made any sale subject to the provisions of Code of Civil Procedure section 873.600,[6] which he apparently understood to empower the owners to dictate terms of sale, at any time, by unanimous agreement.[7] He stated, "Were it not for the stipulation [imposing new terms], I would confirm this sale. I've read

---

[4] In his return and report, Engles stated that the property was narrow and irregular, and that "[a]lone," it could not "support any development." He stated that the governing general plan required the owner of the property to jointly develop a master development plan with the owners of an adjacent 49-acre tract. He reported that DiNapoli had entered into a letter of intent with the neighboring owners to purchase their tract, and had also agreed to construct internal roadways on their property. "These actions," he concluded, "will allow the DiNapoli Companies to develop the properties in accordance with the General Plan."

[5] Counsel wrote that his clients "object on the grounds that escrow is not to close until September 11, 2003." As we have observed (see fn. 3, *ante*), the agreement could apparently be construed to permit a closing as late as March 2004.

[6] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

[7] Section 873.600 provides, "Notwithstanding any other provision of this title, the court shall order sale by such methods and upon such terms as are expressly agreed to in writing by all the parties to the action." As discussed below, this provision is intended only to permit the owners

the referee's report. I see absolutely no reason whatsoever to quarrel with anything that he put in that report. It seems to me that this deal is a good deal." Ultimately, however, he denied the motion to confirm the sale without addressing any of the specific objections raised by the owners to the DiNapoli proposal. No appeal was taken from this order.

On December 20, 2002, Engles filed a motion asking the court to (1) remove him as referee; (2) relieve SVLG as attorneys and award them fees of $54,841.17; (3) relieve Grubb as broker and award it a commission of $194,765.47; and (4) assess these charges as costs of partition, apportion them among the owners, and impose corresponding liens on the property in favor of SVLG and Grubb. The Berliner firm filed a purported "Joinder" in the motion, seeking recovery of $10,997.19 in fees.[8]

The owners opposed these motions on a variety of grounds. One group of owners objected that (1) the only offer presented for confirmation had been unacceptable to the owners; (2) the property had not been sold, and there was no assurance the sale would have been consummated even if it had been confirmed; (3) the proposed contract failed to conform to the terms of the order of reference because the property had not been sold "to the highest bidder" on "terms acceptable to the owners"; and (4) while the referee was entitled to a reasonable fee for his services, he had presented no accounting sufficient to permit the court to fix such a fee. Counsel for another group of owners objected that Grubb had failed to fulfill the conditions in the listing agreement by procuring a buyer who was "ready, willing, and able to purchase the property . . . on terms acceptable to the owner . . . ." (Original underscoring.) It was further asserted that the proposed contract failed to meet the requirement of the order of reference that any bid or offer "shall be accompanied by a minimum of ten percent (10%) of the amount of the offer or bid." The owners also objected to the requests for attorney fees.

Judge Kevin McKenney granted all motions, awarding attorney fees and allowing a commission in the amounts requested. He apportioned these charges among the owners in proportion to their respective interests, and imposed liens on the property in favor of SVLG, Berliner, and Grubb.

---

to prescribe the terms to be included in any sale the referee may later negotiate—not to peremptorily veto a sale after it is presented for confirmation.

[8] No objection has been raised to the time or manner of Berliner's joinder in the motion. (See *Village Nurseries v. Greenbaum* (2002) 101 Cal.App.4th 26, 46–47 [123 Cal.Rptr.2d 555] [notice of joinder failed to constitute a motion permitting entry of summary judgment in favor of joining party]; *Decker v. UD Registry, Inc.* (2003) 105 Cal.App.4th 1382, 1391 [129 Cal.Rptr.2d 892] [same, joinder in special motion to strike was ineffectual where it failed to pray for relief on joining party's behalf]; cf. *Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 31, fn. 3 [1 Cal.Rptr.3d 390] [joinder in special motion to strike was effective where it requested relief on behalf of moving party and was binding on him].)

The owners filed a timely notice of appeal. (Cal. Rules of Court, rule 2(a).) The order is appealable. (See section 904.1, subd. (a)(2), (9); *Solis v. Vallar* (1999) 76 Cal.App.4th 710 [90 Cal.Rptr.2d 677]; *Dunn v. Dunn* (1902) 137 Cal. 51, 56–57 [69 P. 847]; *Henneberque v. City of Culver City* (1985) 172 Cal.App.3d 837, 842 [218 Cal.Rptr. 704]; *Muller v. Martin* (1953) 116 Cal.App.2d 431 [253 P.2d 686].)

## I. *Broker's Commission on Unconsummated Sale*

The owners contend that the order awarding a commission to Grubb cannot be sustained in light of Probate Code section 10160, which precludes real estate commissions on unconsummated sales of estate property.[9] They contend that this prohibition is made applicable to partition actions by section 873.745, which provides that in an action to partition property by sale, "[t]he amount of agents' commissions on the sale, if any, shall be fixed by the court and divided or limited in the manner provided for private sales of real property in decedents' estates." Because the sale to DiNapoli was neither confirmed nor consummated, they contend, Probate Code section 10160 flatly barred the court from awarding a commission.[10]

The pivotal question is whether section 873.745 has the effect of making Probate Code section 10160 applicable to partition actions. Grubb offers no coherent basis for concluding that it does not. Such an argument might be predicated on the latter statute's use of the term "estate" to describe the exemption from liability. While that term has a variety of meanings, in Probate Code section 10160 it is manifestly used to mean "decedent's estate." There is of course no decedent's estate in the present proceeding, or in most partition actions. However the use of that term cannot be understood as intended to limit the exemption provided, but merely as a convenient way of describing its effect. In conjunction with related statutes, Probate Code section 10160 has the effect of creating a broad bar to contractual recovery by

---

[9] Section 10160 of the Probate Code provides: "The estate is not liable to an agent, broker, or auctioneer under a contract for the sale of property or for any fee, commission, or other compensation or expenses in connection with a sale of property unless the following requirements are satisfied: [¶] (a) An actual sale is made. [¶] (b) If court confirmation or approval is required, the sale is confirmed or approved by the court as required. [¶] (c) The sale is consummated."

[10] Regrettably, this objection was not raised in the trial court, where it might have obviated much of the present appeal. Grubb does not contend, however, that the failure to raise it below precludes the owners' reliance on it here. If the objection is sound—as we conclude it is—it concerns a "non-curable defect of substance" of the type that can be raised at any time. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 398, p. 450.) The result might be different if the error had consisted only of allowing a percentage of the sale price rather than fixing a reasonable sum based on the value of the referee's services. But the award was made in favor of Grubb, not Engles. As we read the statutes, the court had no power to award a commission to a broker on an unconsummated sale.

any broker based on an unconsummated sale. The administrator of the estate, who is the only other apparent candidate for such liability, is separately exempted from liability on a commision contract. (Prob. Code, § 10150, subd. (b).)

Furthermore, while partition involves no "estate" in the probate sense, it does present a close analog in the property being partitioned. Indeed, the term "estate" appears in the partition statutes, though in reference less to the *physical* property than to the precise *interest* or *title* in property to be affected by the action. (See §§ 872.230, subd. (d) [requiring that complaint in partition action set forth "[t]he estate as to which partition is sought"], 872.510 [requiring plaintiff to "join as defendants in the action all persons having or claiming interests of record . . . in the estate as to which partition is sought"].) We are therefore unable to infer from the use of the term "estate" that the Legislature meant Probate Code section 10160 *not* to apply to partition actions along with other Probate Code provisions affecting the recovery of commissions.

This observation, however, brings us to a second potential ambiguity, which arises from section 873.745's reference to the *"amount of"* commissions, which it directs the court to "fix[] . . . and divide[] or limit[] in the manner provided for private sales of real property in decedents' estates." (Italics added.) This choice of words might support an argument that the Legislature meant only to import those Probate Code provisions concerning the calculation and allocation of commissions, not provisions (such as Prob. Code, § 10160) concerning the categorical *entitlement* to a commission, or lack of same.

Assuming a potential ambiguity in this respect, the legislative history supports applying section 873.745 as incorporating the Probate Code's provisions concerning entitlement to commissions as well as those concerning their calculation. Section 873.745 was adopted in 1976 as part of a wholesale revision and recodification of the partition laws. One of the problems the revision was intended to address was that "[t]he existing partition statute lack[ed] procedural detail concerning partition sale procedure." (13 Cal. Law Revision Com. Rep. (1976) p. 416.) The Law Revision Commission recommended that "the necessary detail be supplied, either by reference to procedural provisions governing execution sales or by adaptation, where appropriate, of provisions governing probate sales." (*Ibid.*)[11] After discussing the desirability of importing certain provisions concerned with increased bidding on sales, the Commission wrote, "To fill the gap in the existing

---

[11] The reference to "adaptation" supports the earlier conclusion that application of Probate Code section 10160 is appropriate notwithstanding the slight malapropism involved in using the term "estate," as it used there, in the context of a partition sale.

partition statute, the court should in all cases allow, fix, limit, and divide agents' commissions in the manner provided for probate sales." (13 Cal. Law Revision Com. Rep., *supra*, at p. 418.) This explicit endorsement of "allow[ing]" commissions in accordance with probate procedures directly supports the application of the flat prohibition on such allowance in Probate Code section 10160.

Moreover, in the comment to section 873.745, the Commission expressly referred to former Probate Code section 760, the predecessor of current Probate Code section 10160 then in effect, as one of several "statutory provisions as to agents' commissions" to be incorporated into partition actions. (13 Cal. Law Revision Com. Rep., *supra*, at p. 460, reprinted at 17A West's Ann. Code Civ. Proc. (1980 ed.) foll. § 873.745, p. 560.) As in effect at that time, former Probate Code section 760 provided in part that "no liability of any kind shall be incurred by the estate" on a brokerage agreement "unless an actual sale is made and confirmed by the court." (Former Prob. Code, § 760, as enacted by Stats. 1974, ch. 1422, § 1, pp. 3124–3125.) This language has been in the Probate Code since at least 1931. (Stats. 1931, ch. 281, § 760, p. 636.) The Commission's expression of intent to incorporate the statute containing this language is further evidence that it meant to incorporate into partition sales the categorical bar against commissions on unconsummated sales.[12]

Only two published cases rely on section 873.745. Neither involved an unconsummated sale, but both may be understood to rely on the Probate Code to determine whether a broker was *entitled to* a commission. In *Simonini v. Passalacqua* (1986) 180 Cal.App.3d 400 [225 Cal.Rptr. 588], the question was whether a broker who had no agreement with the referee could receive a partial commission based on his production of the original offer (i.e., the offer brought before the court for confirmation), where another bidder ultimately purchased the property by outbidding the original offeror at the confirmation hearing. The court held that under the Probate Code sections then in effect only an "agent holding the contract" was entitled to a partial commission. (*Id.* at pp. 404–405, quoting former Prob. Code, § 761.) The court described section 873.745 as incorporating the provisions of the Probate Code concerning "[t]he *right* to receive a commission." (*Id.* at p. 403, italics added.) In *Melikian v. Aquila, Ltd.* (1998) 63 Cal.App.4th 1364 [74 Cal.Rptr.2d 739], the court reached the opposite result based on intervening statutory changes. Again, however, it was assumed that the Probate Code

---

[12] Although former versions of the statute did not expressly require *consummation* of the sale, as distinct from confirmation, they had long been construed to imply such a requirement. (*Estate of Lopez* (1992) 8 Cal.App.4th 317, 322 [10 Cal.Rptr.2d 67], discussing *Wilson v. Fleming* (1930) 106 Cal.App. 542, 549 [289 P. 658], and *Estate of Rule* (1944) 25 Cal.2d 1, 16 [152 P.2d 1003], disapproved on another point in *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 866, fn. 2 [44 Cal.Rptr. 767, 402 P.2d 839].)

provisions applied even if they did not affect only the calculation of, but also the entitlement to, a commission.

Grubb cites numerous cases holding that a broker can recover on an unconsummated sale, notwithstanding that the listing agreement conditions the commission on consummation, where the transaction and thus the satisfaction of the condition are thwarted by the seller's own conduct. Granting that this is ordinarily the rule, we are powerless to apply it where it conflicts with a paramount statutory directive. The Legislature has unmistakably issued such a directive in connection with estate sales. Grubb offers no reason to suppose that a different rule should apply, or was legislatively intended to apply, to partition sales.

Moreover it is far from clear that the facts here fit within the pattern reflected in the cited cases. In those cases the *owner* had *personally assented* to the essential terms of sale, either in hiring the broker[13] or by initially approving the essential terms of an offer produced by the broker.[14] Here

---

[13] See *Neilson v. Lee* (1882) 60 Cal. 555, 565 (seller "refused to sell the property to [buyer], at the price and on the terms which the [seller] had agreed with the [broker] to sell it"); *Lathrop v. Gauger* (1954) 127 Cal.App.2d 754, 757 [274 P.2d 730] (seller "engaged the services of plaintiff to negotiate a sale of the property for $85,000"); *Fiske v. Soule* (1890) 87 Cal. 313, 317 [25 P. 430] (listing agreement specified per-foot price with and without crops); *Merriman v. Wickersham* (1904) 141 Cal. 567, 569 [75 P. 180] (seller had given brokers "a power of attorney to sell certain described property for the sum of thirty thousand dollars"); *Freeman v. Creelman* (1922) 60 Cal.App. 14, 15 [212 P. 56] [seller and broker agreed to sale for $450 per acre]; *Herz v. Clarks Market* (1960) 179 Cal.App.2d 471, 472 [3 Cal.Rptr. 844] (agreement to find buyer for lease; "[t]he price and terms of payment were stated"); *Realty Bonds & Finance Co. v. Point Richmond Canal & Land Co.* (1915) 171 Cal. 238, 241 [152 P. 433] (seller and broker agreed on "[a] form of contract to be used in making sales of lots"); *Stanton v. Carnahan* (1911) 15 Cal.App. 527, 528 [115 P. 339] (commission agreement was part of purchase agreement); *Coulter v. Howard* (1927) 203 Cal. 17, 19–20 [262 P. 751] (seller and broker agreed orally that latter should find buyer for $60,000); *Williams v. Freeman* (1939) 35 Cal.App.2d 104, 105 [94 P.2d 817] (owners agreed with broker "to sell said real property for the price therein stated").

[14] *Phelan v. Gardner* (1872) 43 Cal. 306, 310–311 (broker procured buyer with whom seller orally agreed on terms before repudiating agreement and selling to another); *Collins v. Vickter Manor, Inc.* (1957) 47 Cal.2d 875, 880 [306 P.2d 783] (complaint sufficiently alleged that defendant seller " 'approve[d] and agree[d] to'·" purchaser's terms); *Green v. Linn* (1962) 210 Cal.App.2d 762, 766 [26 Cal.Rptr. 889], quoting *Wesley N. Taylor Co. v. Russell* (1961) 194 Cal.App.2d 816, 826 [15 Cal.Rptr. 357] (" 'While the primary duty of a broker . . . is to procure a purchaser who is ready, able and willing to buy upon the terms prescribed by the owner, the latter by accepting the proffered purchaser and entering into a contract with him . . . upon the original or other terms is estopped to deny the purchaser's ability or readiness to perform and estopped to deny the broker's right to his commission' "); *Torelli v. J. P. Enterprises, Inc.* (1997) 52 Cal.App.4th 1250, 1256 [61 Cal.Rptr.2d 76] (after expiration of listing agreement, buyer agreed to "substantially the same terms" set out by seller while listing in effect); *Diamond v. Huenergardt* (1959) 175 Cal.App.2d 214, 219 [346 P.2d 37] ("where an owner of property accepts the offer made by a person produced by the broker employed to make the sale, he

neither the owners nor the referee entered an agreement with Grubb prescribing essential terms, most notably price, to which they would agree. Nor did Grubb present an offer to which the owners, as distinct from the referee, initially agreed. In short, this was never shown to be a case in which the seller agreed to a set of essential terms and then changed his or her mind. So far as the record shows, the owners had always been unanimously opposed to a price any lower than $10 a foot, but had simply neglected to specify that opposition before Grubb and Engles brought such an offer forward.

■ Grubb contends that the owners were properly held liable based on a finding, which we must infer in support of the judgment, that they *prevented performance* of the listing agreement by imposing new terms so incompatible with prevailing market conditions that they effectively removed the property from the market. Again there is no doubt about the soundness of the general principle cited, i.e., a seller may be liable for preventing a broker from performing under an exclusive listing agreement. Again, however, Grubb fails to explain how this general principle can be applied in the face of a categorical statutory bar to liability. And again the cases cited by Grubb appear inapposite, though for a different reason. In all of the cited cases, the listing agreement granted the broker an exclusive right *of specified duration.* (*Kimmell v. Skelly* (1900) 130 Cal. 555, 558 [62 P. 1067] [30 days]; *Leonard v. Fallas* (1959) 51 Cal.2d 649, 651 [335 P.2d 665] ["three weeks"]; *Carlsen v. Zane* (1968) 261 Cal.App.2d 399, 400 [67 Cal.Rptr. 747] [90 days]; *Baumgartner v. Meek* (1954) 126 Cal.App.2d 505, 506 [272 P.2d 552] ["the period of time beginning January 8, 1951 and ending March 1, 1951"]; *Alderson v. Houston* (1908) 154 Cal. 1, 3 [96 P. 884] [18 months].) An exclusive listing agreement that fails to specify a termination date is voidable at the owner's instance. (Bus. & Prof. Code, § 10176, subd. (f); see *Nichols v. Boswell-Alliance Const. Corp.* (1960) 181 Cal.App.2d 584, 587 [5 Cal.Rptr. 546] (*Nichols*).) The listing agreement here stated that it covered a period "ending at midnight on To be determined." While we find it unnecessary to reach the owners' contention that the absence of a termination date independently barred recovery, we do note that had the agreement been entered directly between Grubb and the owners, the latter would have been entitled to disaffirm it at any time prior to Grubb's production of a conforming offer. (*Nichols, supra,* 181 Cal.App.2d at p. 587.) It is difficult to conceive how

thereby admits the readiness, willingness and ability of the purchaser to consummate the sale"); *Lawrence Block Co. v. England* (1962) 211 Cal.App.2d 318, 323 [27 Cal.Rptr. 362] (buyers accepted seller's signed counteroffer); cf. *Donnellan v. Rocks* (1972) 22 Cal.App.3d 925, 931 [99 Cal.Rptr. 692] (duty of *buyer* to pay commission when broker engaged by buyer secures suitable property and willing seller).

they could be liable for impeding the performance of a contract they were entitled to disaffirm entirely.

Grubb's only direct response to the owners' assertion of Probate Code section 10160 is a passing suggestion that they should be estopped to assert it because they "affirmatively act[ed] to prevent the sale that would otherwise have been confirmed by the court and consummated by the purchaser." No effort is made to marshal pertinent authority in support of this contention. Even assuming that an estoppel might be successfully raised in a proper case, no sufficient basis for such a result appears here.

First, it is at best a gross oversimplification to assert that the owners brought about the failure of the DiNapoli sale by "impos[ing] . . . an above-market price requirement." The owners did not have the power to "impos[e] . . . requirement[s]" while a sale was pending. To be sure, they implicitly *claimed* such a power by invoking section 873.600 in connection with their stipulation adopting minimum terms—including, most notably, a $10 per square foot price. The court manifestly accepted this claim, concluding that the owners had the power to "dictate the terms" of sale. In this respect, however, the owners led the court into error.

 Nothing in the law governing partition actions empowers the parties to veto a sale by imposing new terms while a motion to confirm is pending. Section 873.600 is intended only to empower the owners to specify terms and conditions of sale *prior to* the referee's entry into a contract. It provides, "Notwithstanding any other provision of this title, the court *shall order sale* by such methods and upon such terms as are expressly agreed to in writing by all the parties to the action." (§ 873.600, italics added.) As used in the partition statutes, the "sale" of the subject property occurs when the referee *enters into an agreement* to sell the property. (See § 873.710, subd. (a) ["Upon making a sale of property, the referee shall report the sale to the court"].) By declaring that "the court *shall order sale*" in accordance with agreed methods and terms, section 873.600 explicitly speaks from the time before a sale has occurred, i.e., before the referee has entered into an agreement. This understanding is consistent with the placement of section 873.600 in article 2 of title 10.5 of chapter 6 of the Code of Civil Procedure. That article—which the Law Revision Commission entitled Sales Procedures (13 Cal. Law Revision Com. Rep., *supra*, at p. 451)—empowers the court to direct, approve, or prescribe various terms of sale, the contents of any notice of sale, and the procedures to be employed in selling the property. (See §§ 873.600–873.690.) The article is thus concerned with matters to which the court must attend *before* the property is sold. Section 873.600

therefore cannot be understood to empower the court to impose new terms *after* a sale is reported by the referee, and while its confirmation is pending. The statutes governing those proceedings appear in article 3 of the above cited chapter, under the title Consummation of Sale. (13 Cal. Law Revision Com. Rep., *supra*, at p. 457.)

■ This context confirms the sense conveyed by the wording of the statute itself that section 873.600 is intended only to require that the court give effect to the unanimously expressed wishes of the parties in formulating an interlocutory judgment and deciding what terms to include in the order of reference or notice of sale. This is not to say that section 873.600 loses all force after an interlocutory judgment has entered. The owners may well be entitled to come forward at some later time and, by unanimous consent, seek an order prescribing new terms to be included in instructions to the referee or in any future notice of sale. Further, the owners' wishes, or more precisely their unanimous belief that the property can and should be sold on substantially more advantageous terms than those offered for confirmation, may and should be weighed by the court in deciding whether to confirm a sale. But section 873.600 cannot reasonably be understood to grant the owners a peremptory *veto* over a sale that has *already been made* and is now brought before the court for confirmation. To make the owners' belatedly expressed preferences binding on the court at that stage would license them to trifle with the court, wasting its time and that of other participants, and ultimately reducing the efficacy of judicial partition sales by reducing the willingness of purchasers and others (including brokers) to participate in such transactions.

The owners' conduct here in leading the court into error would certainly prevent them from challenging the order denying confirmation. (See 9 Witkin, Cal. Procedure, *supra*, Appeal, § 383, p. 434 [doctrine of invited error].) On this record, however, that conduct cannot form the basis for an estoppel to raise the categorical bar of Probate Code section 10160 to Grubb's claim for a commission. It is far from clear that the DiNapoli sale should or could have been confirmed on a full presentation of the pertinent facts and principles. The terms of the sale diverged from those prescribed in the interlocutory judgment and the notices of sale by permitting reduced deposits and a greatly protracted closing period. As we read the contract, the purchaser could tie up the property for up to 15 months on a deposit of approximately 8 percent of the purchase price, much or all of which could be refunded upon the occurrence of certain contingencies. Had the owners challenged these variances rather than attempting to exercise a nonexistent veto power, they might well have defeated confirmation on the merits. (Cf. § 873.730, subd. (b) ["The court may confirm the sale notwithstanding a variance from the prescribed terms of sale if to do so will be beneficial to the parties and will not result in substantial prejudice to persons interested in the sale"].) In any

event, nothing in the owners' attempt to prevent such a sale was so distinctly inequitable as to support an estoppel.

■ Furthermore, given the substantial uncertainties to which DiNapoli's performance under the contract was subject, it is far from clear that Grubb would have ever recovered a commission even if the sale had been confirmed. It is entirely possible that the transaction would have ultimately failed due to the occurrence of one of the terminating conditions. Estoppel is fundamentally an equitable doctrine; its purpose is not to confer windfalls, but to restore a party to the position it would have occupied but for another party's inequitable conduct. Here Grubb was permitted to reap rewards that might well never have come its way otherwise.

A more finely tuned remedy—and one more consistent with the governing statutes—is provided by section 873.010, subdivision (b)(3), which empowers the court to "[f]ix the reasonable compensation for the services of the referee and provide for payment of the referee's reasonable expenses." A reversal of the order allowing a commission will not leave Engles, or his principal Grubb, without any remedy. Engles was made referee on the understanding that a real estate commission to Grubb would be accepted in lieu of a referee's fee. Since Grubb's claim to a commission cannot be sustained, we see no reason to doubt the trial court's power to award a referee's fee to Engles.[15] We recognize that, in expectation of a commission, Engles may have failed to maintain hourly records. Under the circumstances, however, the trial court must enjoy some latitude to fix a reasonable fee based upon estimated time devoted to, and benefit conferred upon, the owners.

■ In sum, we find no basis on which the owners can be estopped to raise Probate Code section 10160 and its categorical prohibition against commissions on an unconsummated sale. We therefore conclude that the allowance of a commission was error.

## II. *Attorney Fees*

The owners attack the fee awards to both the SVLG and Berliner firms. With respect to SVLG, the owners object primarily on the ground that the court allowed fees for activities of SVLG attorneys after a conflict of interest

---

[15] The appeal of this remedy may seem to depend on the fortuity that Engles is a vice-president of Grubb, such that any compensation flowing to him ·as referee may also compensate for Grubb's loss of a commission. However it is no less a fortuity that the owners were only permitted to "veto" the sale in error. Had that not occurred, Grubb might either have secured confirmation of the sale, or the sale would have been denied in an exercise of the court's discretion, leaving Grubb with no more remedy than it has now. The owners' "veto" has created a situation which may safely be characterized as unique.

had arisen by virtue of SVLG's preexisting relationship with the prospective purchaser, DiNapoli. The owners cite rule 3-310 of the Rules of Professional Conduct, which prohibits the representation of adverse interests, or clients with adverse interests, in the absence of written consent.[16] The owners note that courts have often withheld fees for services rendered in violation of these rules. (E.g., *Jeffry v. Pounds* (1977) 67 Cal.App.3d 6, 10–12 [136 Cal. Rptr. 373]; *Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 618–624 [120 Cal.Rptr. 253].) Without citing pertinent portions of the record, the owners contend that fees were improperly allowed for (1) review of DiNapoli's offering letter and conferring with Engles regarding same, (2) communications with DiNapoli "about the transaction," (3) seeking to "force confirmation of the contract for sale" notwithstanding the owners' objections, and (4) conducting "research and meetings about the conflict."

■ Much of the owners' argument implicitly treats SVLG as having been *the owners'* attorney. But SVLG was engaged to represent the referee. We will not lightly assume that an attorney engaged by a partition referee owes the same duties to the owners that he owes to his own clients, including the referee. We note that in general, an attorney engaged by a *trustee* does not thereby become an attorney for the trust's *beneficiaries*. (*Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201, 213 [91 Cal.Rptr.2d 716, 990 P.2d 591] (*Wells Fargo*), italics in original ["the *trustee*, rather than the beneficiary, is the client of an attorney who gives legal advice to the trustee, whether on the subject of trust administration [citations] or of the trustee's own potential liability"]; *id.* at p. 212, quoting *Fletcher v. Superior Court* (1996) 44 Cal.App.4th 773, 777 [52 Cal.Rptr.2d 65] [" 'The attorney for the trustee of a trust is not, by virtue of this relationship, also the attorney for the beneficiaries of the trust. The attorney represents only the trustee' "]; see *Lasky, Haas, Cohler & Munter v. Superior Court* (1985) 172 Cal.App.3d 264, 282 [218 Cal.Rptr. 205].) "Because no such relationship is implied in law [citation], . . . the existence of such a relationship (and its propriety under the rules prohibiting conflicts of interest) would have to be determined on the facts of each individual case." (*Wells Fargo, supra,* 22 Cal.4th at p. 212.) Here the owners made no attempt to establish that they themselves became clients of SVLG. This raises a serious question about their standing to protest the alleged representation of adverse interests.

---

[16] Rule 3-310 of the Rules of Professional Conduct provides in pertinent part as follows:

"(C) A member shall not, without the informed written consent of each client:

"(1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or

"(2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or

"(3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter."

■ Furthermore, the owners make no attempt to establish that SVLG's alleged misconduct was so incompatible with the faithful performance of its duties as to require disallowance of fees. In *Pringle v. LaChapele* (1999) 73 Cal.App.4th 1000 [87 Cal.Rptr.2d 90] (*Pringle*), a client who had been jointly represented along with a corporation of which he was a principal sought to avoid an attorney's claim for fees on the ground that while the client himself had executed a written waiver on behalf of the corporation, no *disinterested* corporate agent had done so as required by rule 3-600 of the Rules of Professional Conduct. The court noted that while "an attorney's breach of a rule of professional conduct *may* negate an attorney's claim for fees," the client had failed to show that it *automatically* did so. (*Pringle, supra,* 73 Cal.App.4th at p. 1005, italics added, fn. omitted.) The court noted that the lead case on this subject, *Clark v. Millsap* (1926) 197 Cal. 765 [242 P. 918], "seems to suggest [that] there must be a serious violation of the attorney's responsibilities before an attorney who violates an ethical rule is required to forfeit fees." (*Pringle, supra,* 73 Cal.App.4th at p. 1006.) Such a violation might arise where the representation involved elements of fraud, unfairness, acts in violation or excess of authority, acts inconsistent with the character of the profession, or acts incompatible with the faithful discharge of the attorney's duties. (*Ibid.*) The court rejected the client's challenge because the appellate record was not sufficient for the court to "ascertain if the purported violation of the rules was serious, if any act was inconsistent with the character of the profession, or if there was an irreconcilable conflict. We do not know if the interests of [the individual and corporate clients] diverged or if [the attorney] had obtained or would expect to obtain confidential information which might have been harmful to one client, but helpful to another. Thus, we cannot ascertain if the purported rule violation by [the attorney] was incompatible with the faithful discharge of her duties." (*Id.* at pp. 1006–1007; see *id.* at p. 1006, fn. 5, quoting Rest. 3d, Law Governing Lawyers (Proposed Final Draft No. 1, Mar. 29, 1996) § 49, p. 187, italics added [" 'A lawyer engaging in *clear and serious* violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter. In determining whether and to what extent forfeiture is appropriate, relevant considerations include the gravity and timing of the violation, its willfulness, its effect on the value of the lawyer's work for the client, any other threatened or actual harm to the client, and the adequacy of other remedies' "], and quoting Hazard & Hodes, The Law of Lawyering (1998 Supp.) § 1.5:108, p. 108 [fee may be forfeited as " 'sanction for gross abuse by the lawyer of obligations to the client, or other serious violations of the law of lawyering' "].)

■ Here too the owners fail to show that any violation of the rules governing representation of adverse interests was *serious* enough to *compel* a forfeiture of fees. Insofar as these questions were entrusted either to the trial

court's discretion or its factfinding powers, we cannot substitute our judgment for the trial court's except on a clear showing that those powers were abused.

The owners also complain that some of SVLG's services should not have been allowed because they were of no value to the owners. In the absence of contrary authority, the fees must be assumed to be compensable whether or not they ultimately served the owners' interests. (See *Wells Fargo*, *supra*, 22 Cal.4th at p. 213 ["Under California law, a trustee may use trust funds to pay for legal advice regarding trust administration [citation] and may recover attorney fees and costs incurred in successfully defending against claims by beneficiaries [citations]. When the law gives the trustee a right to use trust funds, or to reimbursement, the funds do not in law belong to the beneficiaries"].) Nor do the owners demonstrate that SVLG "actually aided the Referee in a breach of his fiduciary duties." They do not precisely identify the supposed breach, but assert only that SVLG "must have known that Mr. Engles was working *against* the best interests of his fiduciaries [*sic*]" and that "a cursory comparison of the terms of the Interlocutory Judgment with the terms of the DiNapoli contract reveal that the proposed sale did not meet the requirements of the Interlocutory Judgment (or the 'Exclusive Authorization of Sale')." The record fails to establish that the sale proposed by Engles was against the owners' best interests or in any sense a breach of his duties to them. Accepting that the DiNapoli contract varied materially from the terms of the interlocutory judgment and notices of sale, it does not follow that its presentation was a breach of fiduciary duties.

The owners fail to carry their burden of showing it was error to allow the fees claimed by SVLG.

In much the same vein, the owners assert that the services rendered by Berliner were not performed "for the common benefit" (§ 874.010, subd. (e)) because "the deal they were working on was at odds with the Interlocutory Judgment and Appellants' interests." Again no attempt is made to particularize or substantiate the factual premise. We therefore need not consider the soundness of the legal premise, i.e., that attorney fees incurred by a referee are categorically noncompensable if not incurred "for the common benefit." (See § 874.010, subd. (b) ["costs of partition" include "fee and expenses of the referee"]; cf. *id.*, subd. (a) [costs include attorney fees "incurred or paid by *a party* for the common benefit" (italics added)]; *id.*, subd. (e) [costs include "[o]ther disbursements or expenses determined by the court to have been incurred or paid for the common benefit"]; *Wells Fargo*, *supra*, 22 Cal.4th at p. 213.)

### DISPOSITION

The order allowing a commission is reversed and the matter is remanded to permit referee Engles to seek reasonable compensation for his own services and expenses under section 873.010, subdivision (b)(3). In all other respects, the orders appealed from are affirmed. Each side will bear its own costs on appeal.

The writ of supersedeas previously granted will remain in effect until issuance of this court's remittitur, or further order.

Elia, J., and McAdams, J., concurred.