[No. B182966. Second Dist., Div. Seven. June 18, 2007.]

MARDIROSSIAN & ASSOCIATES, INC., Plaintiff and Respondent, v.
SETH ERSOFF, Defendant and Appellant;
PHILIP A. LEVY, Objector and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 4 and 6 of the Discussion.

## COUNSEL

Law Offices of Philip A. Levy and Philip A. Levy for Defendant and Appellant and for Objector and Appellant.

Law Offices of Charles B. O'Reilly and Charles B. O'Reilly; Mardirossian & Associates, Inc., Garo Mardirossian and Jill McDonell for Plaintiff and Respondent.

## OPINION

**PERLUSS, P. J.**—Seth Ersoff appeals from the judgment entered in this action in quantum meruit filed by his former legal counsel, Mardirossian & Associates, Inc. (M&A), to recover attorney fees. Ersoff asserts the trial court committed multiple errors before, during and after trial and contends the jury's special verdict is not supported by substantial evidence. Ersoff and his trial counsel also challenge an order imposing monetary sanctions against each of them "jointly and severally" in the amount of $3,500. We affirm.[1]

---

[1] Ersoff challenges the sanctions order as part of his appeal from the judgment. (See Code Civ. Proc., § 904.1, subd. (b) [sanction orders or judgments of $5,000 or less against party or an attorney for party may be reviewed on appeal after entry of final judgment in main action].)

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Infomercial Deal*

Ersoff managed the careers of Sugar Ray Leonard, the former Olympic boxing gold medalist and world champion, and Billy Blanks, a physical trainer who had developed an exercise program called Tae Bo. In March 1998 Ersoff entered a written agreement with Universal Management Services, Inc. (UMSI), an infomercial production company, and its president, Paul Monea, to create an infomercial marketing Blanks's Tae Bo program. After Leonard gave Ersoff a videotaped testimonial for the Tae Bo tapes, Ersoff, purportedly on Leonard's behalf, signed Leonard's name to a testimonial release authorizing UMSI's use of the videotape for the infomercial under certain conditions. Under the terms of Ersoff's own agreement with UMSI, Ersoff would receive five percent of adjusted gross revenue from the Tae Bo infomercial. Within a few days of Ersoff's execution of the agreement with Monea and UMSI, Leonard notified UMSI that he did not wish the videotaped testimonial or his name to be used in connection with the infomercial.

### 2. *Ersoff Retains M&A to Prosecute His Claim in the Tae Bo Litigation*

Ersoff became concerned UMSI did not intend to honor its agreement to pay him a percentage of the profits generated by the infomercial sales. Accordingly, in August 1998 Ersoff asked M&A and, specifically Garo Mardirossian, the firm's named partner, to represent him in an action he wished to file against UMSI potentially involving, among other things, breach of contract, fraud and related tort claims. Ersoff, a law school graduate, told Mardirossian that Leonard wished to participate in the action and to sue UMSI for the unauthorized use of his name and likeness and to seek a temporary restraining order enjoining the broadcast of the infomercial. Ersoff suggested to M&A that Leonard's celebrity status would add value to the action by generating publicity and that a temporary restraining order prohibiting UMSI's use of Leonard's name and likeness would help forge a quick settlement, which Ersoff repeatedly informed M&A was his main objective in bringing the lawsuit.

---

Philip A. Levy, Ersoff's trial counsel as well as counsel of record for Ersoff in this appeal, filed a separate notice of appeal from the judgment to challenge the sanctions order imposed against him personally. (See Code Civ. Proc., § 904.1, subd. (b) [authorizing lawyer to appeal on his or her own behalf from order of sanctions of less than $5,000 following entry of judgment]; *20th Century Ins. Co. v. Choong* (2000) 79 Cal.App.4th 1274, 1276–1277 [94 Cal.Rptr.2d 753]; *Caldwell v. Samuels Jewelers* (1990) 222 Cal.App.3d 970, 976 [272 Cal.Rptr. 126].)

M&A initially declined to take the case, concerned about a number of things, including the solvency of UMSI and Monea and the difficulty of obtaining any recovery even if Ersoff were to prevail. However, at Ersoff's repeated insistence, M&A agreed it would represent Ersoff at a 50 percent contingency fee if Mardirossian determined, after meeting with Leonard, that he could fairly represent both Ersoff and Leonard in the action. During a personal meeting with Leonard, Mardirossian advised Leonard that Leonard's involvement would generate publicity with Ersoff likely being the main beneficiary. Leonard replied he was participating in the action to assist Ersoff, he wished to pursue the action and the temporary restraining order primarily to help Ersoff and further communications to him about the case should be directed to Ersoff.

In November 1998 Ersoff signed a retainer agreement that provided M&A would take the matter on a contingency fee basis and retain or claim "50% of any and all sums recovered on behalf of Client from any defendant and/or insurance company which may be paid or become due in settlement, or by judgment or otherwise. [¶] . . . If recovery is not obtained, the Attorney will receive no fee." The retainer agreement further provided, "The Client hereby grants Attorney a lien upon the cause of action, and upon any document, records, or papers in connection therewith and upon any sum received to the extent of the foregoing fees and costs incurred or advanced. Said lien is based upon the reasonable value of Attorney's services valued at $400.00 per hour for Garo Mardirossian and $220.00 per hour for other attorneys of [M&A]. Or, Attorney may elect compensation based upon the agreed contingency for any offer to Client to settle the matter prior to the Attorney's discharge. . . . In the event Client discharges Attorney and/or chooses to terminate the claim, Client agrees to compensate Attorney pursuant to the hourly fee schedule set forth above for efforts expended by Attorney plus all costs advanced by Attorney on Client's behalf. If another attorney assumes responsibility for the file thereafter upon discharge, Client agrees to pay Attorney upon settlement or verdict the reasonable value of services performed by [M&A]. Attorney may elect compensation based upon the agreed contingency for any offer to Client received prior to attorney's discharge." Both Ersoff and Leonard signed separate documents expressly consenting to M&A's representation of them notwithstanding any conflicts of interest.[2]

---

[2] The written consent Ersoff signed provided, "I, Seth Ersoff, with full knowledge, counsel and consent, free of any undue influence, do hereby agree to allow [M&A] to continue representing me in my case against Paul Monea, [UMSI] and any other person or entity I choose to pursue in connection with my dealings with Mr. Monea. Such dealings include but are not limited to the Billy Blanks' TAE BO Infomercial. I have separate counsel with whom I have been given an opportunity to consult regarding this matter. I realize there may be conflicts between my goals and those of Sugar Ray Leonard. If there are any such conflicts of interest, I waive them. [¶] I understand that I am entitled to full advocacy on my behalf and I believe that

### 3. *Ersoff Terminates M&A and Nine Days Later Settles the Tae Bo Litigation*

On April 12, 1999, after M&A had filed a complaint against Monea and UMSI, worked on the case for seven months and prepared for Blanks's deposition scheduled for April 13, 1999, and for a mediation scheduled for April 21, 1999, Ersoff terminated M&A's representation and replaced it with the law firm of Wood, Smith, Henning & Berman, where Ersoff's wife is a partner. At the April 21, 1999 mediation Ersoff received his first settlement offer from Monea and UMSI. Ersoff's case settled that day, with UMSI and Monea agreeing to pay Ersoff $3.7 million.

### 4. *M&A's Complaint Against Ersoff for Attorney Fees*

On November 7, 2002 M&A filed a lawsuit in the Los Angeles Superior Court (case No. BC284854);[3] its operative first amended complaint asserts a single cause of action for quantum meruit seeking at least 50 percent of the $3.7 million settlement amount.[4]

### 5. *The Bifurcated Trial: Phase One*

In February 2004 the trial court granted Ersoff's motion to bifurcate two issues to be decided by the court prior to a jury trial: (1) whether the retainer agreement provided that the reasonable value of M&A's services in the event of a discharge prior to the receipt of a settlement offer was to be measured solely by multiplying the hours the firm spent on the case by the hourly billing rates of the attorneys who worked on the case ($400 for Mardirossian and $220 for his associates) and (2) whether an actual conflict of interest existed between Ersoff and Leonard as to which Ersoff could not, as a matter

---

this will be accomplished by [M&A], whom I hereby give complete authority to represent me." Leonard signed a similar consent.

[3] Initially, M&A's dispute with Ersoff was arbitrated. The arbitrator awarded M&A $1.5 million, which the trial court confirmed. On October 30, 2001, Division One of this court concluded the arbitration award must be vacated because Ersoff had not been properly advised of his right to nonbinding arbitration of attorney fee disputes in accordance with Business and Professions Code section 6201. (See *Ersoff v. Mardirossian & Associates, Inc.* (Oct. 30, 2001, B142063) [nonpub. opn.].) In accordance with the Court of Appeal's decision, the trial court vacated the arbitration award in February 2002. Thereafter, Ersoff notified M&A of his intent to waive his right to arbitration and to litigate the dispute in the superior court.

[4] On November 12, 2002, Ersoff filed his own action for breach of fiduciary duty and declaratory relief (*Ersoff v. Mardirossian, Inc.* (Super. Ct. L.A. County, 2005, No. BC284993)). Initially, the two cases were consolidated. However, only M&A's quantum meruit action against Ersoff was submitted to the jury. The judgment from which Ersoff appeals pertains only to that case and not to Ersoff's claims against M&A.

of law, give his informed consent; and if so, whether M&A's simultaneous representation of both Ersoff and Leonard in the underlying action against UMSI and Monea violated rule 3-310 of the California Rules of Professional Conduct (rule 3-310) and required forfeiture of any right to attorney fees as a matter of law. (See, e.g., *Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 463 [9 Cal.Rptr.3d 693, 84 P.3d 379] [when attorney violates rules of professional conduct by engaging in simultaneous and conflicting representation without obtaining sufficient informed consent, quantum meruit recovery to collect fees may be prohibited under certain circumstances]; *Goldstein v. Lees* (1975) 46 Cal.App.3d 614, 618 [120 Cal.Rptr. 253] [quantum meruit recovery found inappropriate when former corporate counsel labored under a conflict of interest in representing a minority shareholder and director of his former client in a proxy battle in violation of predecessor rule to rule 3-310].)

Following the presentation of testimony and other evidence on the bifurcated issues, the trial court ruled the retainer agreement was unambiguous: When, as here, there had been no settlement offer prior to its discharge, the agreement contemplated M&A would receive the reasonable value of its services as measured by multiplying a reasonable number of hours spent on the case by the attorneys' hourly rates. The court further ruled it was for the jury, as the finder of fact, to determine in the next phase of the proceeding the number of hours Mardirossian and his associates actually worked on the matter and whether that number of hours was reasonable.[5]

The trial court rejected Ersoff's contention that, by simultaneously representing both Ersoff and Leonard in the underlying litigation against UMSI and Monea, M&A had violated rule 3-310 and thus forfeited its right to attorney fees as a matter of law. The court concluded there existed, at most, a potential conflict of interest between Ersoff's and Leonard's interests in the litigation and the consent form Ersoff had executed was sufficient and valid for the potential conflict that existed during the relevant period. The court further found no prejudice to Ersoff as a result of the dual representation.

### 6. *Ersoff's Motion to Dismiss M&A's Complaint and the Court's Imposition of Sanctions*

After the first phase of the trial had been completed, the court set an April 28, 2004 trial date for phase two. Ersoff sought and successfully obtained

---

[5] M&A has filed a protective cross-appeal, to be considered solely in the event the judgment is reversed, arguing the trial court erred in interpreting the retainer agreement to require the reasonable value of services to be measured solely by the number of hours each attorney worked on the case multiplied by that attorney's hourly billing rate. M&A asserts that, under the express terms of the retainer agreement, M&A is entitled to the "reasonable value of services," in which the number of hours worked is but one factor.

several continuances of the trial date. On July 7, 2004, days before the trial was scheduled to begin, Ersoff sought and obtained an additional continuance to November 3, 2004, based on representations by his counsel, the law firm of Riley & Reiner, that it had a scheduling conflict. M&A did not oppose the request. Immediately after the hearing, Ersoff hand-served M&A with a "motion to dismiss the complaint" on the ground M&A was not a corporation at the time it filed its action and thus lacked "standing to prosecute or defend" the instant action.

One week later, on July 14, 2004, Ersoff replaced his trial counsel, Riley & Reiner, with Philip Levy, whom Riley & Reiner had associated in as counsel on January 27, 2004. M&A opposed the motion to dismiss and requested sanctions against Ersoff and Levy in the amount of $7,000 pursuant to Code of Civil Procedure section 128.6, arguing the motion to dismiss was frivolous, designed to harass and delay the trial and omitted pertinent case authority. M&A also argued the continuance that immediately preceded the motion had been obtained under false pretenses and in violation of the local rules of the superior court. The trial court denied Ersoff's motion to dismiss and imposed sanctions against Ersoff and Levy "jointly and severally" in the amount of $3,500.

### 7. The Trial: Phase Two

#### a. Ersoff's motions in limine

Ersoff moved in limine pursuant to Evidence Code sections 350 and 352 to exclude testimony by M&A attorneys as to the number of hours each of them had worked on Ersoff's case. Citing Mardirossian's deposition testimony that, as contingency fee lawyers, neither he nor his associates kept any time records memorializing the time spent on each case, Ersoff argued the testimony was "incompetent and insufficient," M&A's estimates were false and absurd and admission of the testimony would be unduly burdensome, requiring a minitrial as to the amount of work claimed to have been accomplished by each M&A attorney. M&A opposed the motion, arguing each attorney that would testify had personal knowledge of the time he or she had spent on the case and could fairly estimate the number of hours each had worked. The court denied the in limine motion.

Ersoff also moved in limine to exclude testimony by M&A's expert witness, contingency fee attorney Dana Hobart, on the ground that, absent any billing records, M&A's time estimates were too speculative to provide

Hobart a basis to opine on whether those estimates were reasonable. He also argued the expert testimony would not assist the trier of fact, as required for admissibility under Evidence Code section 801. The court denied the motion.

The trial court granted in part and denied in part Ersoff's motion in limine to exclude evidence of the settlement amount in Ersoff's case against Monea and UMSI, permitting evidence of the settlement amount to be disclosed to the jury only to the extent Hobart relied on it in forming his opinion whether the hours M&A had spent on the case were reasonable. Evidence of the amount of M&A's prior arbitration award was excluded.

### b. *The trial testimony of M&A's attorneys*

At trial Mardirossian and three of his associates during the relevant period, Joseph Barrett, Donald Conway and Kathy Mardirossian, testified that, as contingency fee attorneys, they kept no time sheets but could recall the number of hours they worked in total during the relevant period and could fairly estimate the percentage of their work time spent on Ersoff's case. Each testified as to the work he or she specifically accomplished for Ersoff.

Barrett testified that, between August 1998 and April 11, 1999, Ersoff's case was the major matter in the office and Barrett's primary case for that time period. He met or spoke with Ersoff almost daily and explained there were a number of difficult issues in the case that he had to research and resolve including UMSI's rescission claims based on allegations of Ersoff's fraud, UMSI's solvency, receivership issues and difficulty tracking sales from the infomercial. He testified he worked 60 hours per week for Mardirossian during the period August 1998 to April 11, 1999, and estimated 60 percent of that time was spent on Ersoff's case. He also testified that, in late April 1999, he began preparing a written summary of the work he had performed on the case at the request of Ersoff's new firm, but stopped when it appeared an agreement had been reached. The 13-page summary, which details, week by week, the work Barrett states he performed for Ersoff (but does not include a reference to the hours spent), was admitted into evidence without objection.

Conway explained the Ersoff case was also the primary matter that occupied his time from September 1998 until the middle of April 1999 and that he and Barrett worked closely together on every matter in the case. He, like Barrett, was personally involved in drafting or assisting on every one of the pleadings and the unsuccessful attempt to obtain a temporary restraining order against UMSI. Conway also testified at length as to the receivership

issues he worked on with associated counsel and explained that additional work was required when it came to light that Ersoff had made representations to UMSI that he did not disclose to M&A until well into the litigation. According to Conway's estimates, he worked 50 to 60 hours a week from August 1998 to April 11, 1999, and spent two-thirds of that time working on Ersoff's case in 1998 and one-half of that time working on Ersoff's case in 1999, for a total of approximately 1,020 hours.

Kathy Mardirossian testified she worked five to six hours a week for approximately 40 weeks participating in every meeting and strategy session and assisting in drafting pleadings and discovery in the action. She explained this was a conservative estimate and that she took pains to review the file and to discuss the work she performed on the case with the other associates and with Mardirossian to ensure there was no duplication of effort.

Garo Mardirossian testified he worked 60 hours a week from August 1998 to April 11, 1999, and spent approximately 50 percent of that time on Ersoff's case in various capacities, less the four weeks he worked exclusively on another trial. He explained he participated in every meeting, met with Ersoff and his associates and reviewed every pleading and all correspondence that was drafted in regard to the case.

### c. *Expert testimony*

Expert testimony as to whether the number of hours claimed by M&A was reasonable was also presented by both M&A and Ersoff. Testifying as an expert for M&A, Hobart explained, based on his review of the files in the underlying case, as well as all of the pleadings and deposition testimony in the instant case and the multimillion dollar settlement amount, it was reasonable for M&A to have worked approximately 3,700 hours on the matter. He explained that, because contingency fee lawyers' fees depend on the outcome, they often spend many more hours than an hourly attorney would on a case, unconcerned about the mounting hours because the client will not be billed. He also explained the number of hours cannot be determined solely from looking at the tangible work product in the file, such as the pleadings and discovery. In light of the $3.7 million settlement, achieved just days after M&A was substituted out of the case, with little or no additional work accomplished by the firm that substituted in for M&A and the complexity and number of issues involved in the case, Hobart opined that it was not unreasonable for M&A to have put in 3,700 hours worth of work leading up to the eventual settlement in the action.

Alan Jay Weil, an attorney who does not take cases on contingency, testified as an expert for Ersoff. Weil opined that it was preposterous for any firm to have spent 3,700 hours on this case. Based upon the work product in the file in the underlying case, Weil opined that, at most, a reasonable attorney would have spent no more than 200 hours preparing the case from August 1998 to April 11, 1999.

### d. *The jury's verdict and entry of judgment*

In its special verdict the jury found M&A had reasonably spent 2,392 hours on Ersoff's case: Mardirossian had reasonably spent 540 hours on Ersoff's case and M&A associates Conway, Barrett and Kathy Mardirossian had reasonably spent 960 hours, 890 hours and 102 hours, respectively. In accordance with the court's instructions to multiply the hours by each attorney's hourly rate, the jury awarded M&A $645,440. Following the jury's verdict, the court ordered statutory prejudgment interest be added to the verdict amount from the date the complaint had been filed (November 7, 2002) until the date the amount is paid. Judgment was entered on April 6, 2005.

## CONTENTIONS

Ersoff contends (1) the trial court erred in denying his motions in limine to exclude evidence of the number of hours the M&A attorneys worked on Ersoff's case and expert testimony as to whether the claimed hours were reasonable; (2) there is no substantial evidence to support the jury's verdict; (3) prejudgment interest is improper in a quantum meruit action; (4) the jury instructions and special verdict forms were erroneous and resulted in a miscarriage of justice; (5) the court erred in denying Ersoff's motion to dismiss M&A's action for lack of standing; and (6) the court erred in imposing monetary sanctions against him. Ersoff's counsel, Philip Levy, also challenges the sanctions order against him.

## DISCUSSION

### 1. *The Court Did Not Err in Denying Ersoff's Motions in Limine*

#### a. *Governing law and standard of review*

■ " 'The usual purpose of motions *in limine* is to preclude the presentation of evidence deemed inadmissible and prejudicial by the moving party.' " (*Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 669 [56

Cal.Rptr.2d 803] (*Kelly*).) Although in limine motions are typically brought at the beginning of trial, they may also be brought during trial when evidentiary issues are anticipated by the parties. (*Ibid.*) As rulings on the admissibility of evidence, they are subject to review on appeal for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 203 [58 Cal.Rptr.2d 385, 926 P.2d 365] ["appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion"]; *KB Home v. Superior Court* (2003) 112 Cal.App.4th 1076, 1083 [5 Cal.Rptr.3d 587].)

> b. *The trial court did not abuse its discretion in denying Ersoff's motion in limine to prohibit M&A attorneys from testifying as to the hours they spent on Ersoff's case*

Ersoff contends that, because none of the attorneys kept contemporaneous time records, evidence of their time "estimates" was without foundational support and should have been excluded. Contrary to Ersoff's contention, there is no legal requirement that an attorney supply billing statements to support a claim for attorney fees. As this court has held, "An attorney's testimony as to the number of hours worked is sufficient evidence to support an award of attorney fees, even in the absence of detailed time records." (*Steiny & Co. v. California Electric Supply Co.* (2000) 79 Cal.App.4th 285, 293 [93 Cal.Rptr.2d 920]; see also *Martino v. Denevi* (1986) 182 Cal.App.3d 553, 559 [227 Cal.Rptr. 354] (*Martino*) [same].) Of course, the attorney's testimony must be based on the attorney's personal knowledge of the time spent and fees incurred. (Evid. Code, § 702, subd. (a) ["the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter"].) Still, precise calculations are not required; fair approximations based on personal knowledge will suffice: "[T]he general rule [is] that while a plaintiff must show with reasonable certainty that he has suffered damages by reason of the wrongful act of defendant, once the cause and existence of damages have been so established, recovery will not be denied because the damages are difficult of ascertainment." (*Stott v. Johnston* (1951) 36 Cal.2d 864, 875 [229 P.2d 348]; see *ibid.* [proof of lost profits need not be exact but may be estimated based on past volume of business and other provable data relevant to the probable future sales]; see also *GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873 [274 Cal.Rptr. 168] ["Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation"].)

Although none of M&A's contingency fee lawyers kept billing records, each planned to testify that he or she could recall the amount of time spent in total on Ersoff's case, albeit not the amount of time spent preparing each piece of correspondence, discovery or pleading. Citing *Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 64–65 [37 Cal.Rptr.3d 221] *(Ajaxo)* and *Martino, supra,* 182 Cal.App.3d 553, Ersoff insists the trial court should have excluded this testimony as legally "insufficient" to recover fees. Both cases are inapposite.

In *Ajaxo* the prevailing party (Ajaxo) in a breach of contract action sought to recover attorney fees paid to his former counsel prior to trial pursuant to Civil Code section 1717. Ajaxo submitted declarations from its current counsel detailing its work on the case but no evidence from Ajaxo's former attorneys as to the work they had accomplished for Ajaxo: No declarations, " 'no billing records, nothing to support why [the court] should award in excess of $177,000 to these attorneys,' " who, according to the declarations provided by Ajaxo's current counsel, did not even correctly prepare the case for trial. *(Ajaxo, supra,* 135 Cal.App.4th at p. 65.) Considering the absence of any evidence presented by Ajaxo's former counsel, the trial court's conclusion there was no evidence to support Ajaxo's request for pretrial attorney fees paid to its former counsel was well within its discretion. *(Ibid.)*

*Martino* is likewise distinguishable. In *Martino,* a case involving the dissolution of a partnership, an accounting and damages, the trial court awarded $40,000 in attorney fees to the prevailing party based solely on the attorney's request for a "flat fee for 'services rendered.' No documents, such as billing or time records, were submitted to the court, nor was an[y] attempt made to explain, in more than general terms, the extent of services rendered to the client." *(Martino, supra,* 182 Cal.App.3d at pp. 559–560.) The Court of Appeal reversed the attorney fee award. Acknowledging that "[i]n California, an attorney need not submit contemporaneous time records in order to recover fees" *(id.* at p. 559), the court concluded the evidence presented—a mere request for a flat fee for services rendered—was insufficient to support an award. Further hindering the court's review of the award was the trial court's failure to explain the basis for its decision. The case was remanded for a rehearing of the attorney fee issue. *(Ibid.)*

Unlike in *Ajaxo, supra,* 135 Cal.App.4th 21 and *Martino, supra,* 182 Cal.App.3d 553, each attorney in the instant case had personal knowledge of the legal services he or she had performed for Ersoff. Notwithstanding the absence of billing records, each testified at length concerning the work he or she performed, the complexity of the issues and the extent of the work that

was required. There was nothing presented in the motions in limine to suggest to the trial court that such testimony, plainly relevant (see *Glendora Community Redevelopment Agency v. Demeter* (1984) 155 Cal.App.3d 465, 470–471, 478 [202 Cal.Rptr. 389]; *Martino, supra*, 182 Cal.App.3d 553; *Ajaxo*, at p. 64), should be excluded.

■ Ersoff suggests Mardirossian's deposition testimony that any reconstruction of the hours spent would not be exact or accurate should have foreclosed M&A from offering its estimates of the number of hours expended. Although Mardirossian did testify he could not recreate time sheets six years after the fact with any precision, he also testified later in his deposition that he and his associates could review the file and use their own personal knowledge of the time worked to provide fair estimates of the hours spent on the case. His deposition testimony is not inconsistent with his trial testimony on that point; but, even if it were, the trial court properly concluded such inconsistency was to be evaluated by the trier of fact. (*Kelly, supra*, 49 Cal.App.4th at p. 673.) As our Division Four colleagues recognized in *Kelly*, although a party may be precluded from introducing evidence contrary to its response in a request for admission (Code Civ. Proc., § 2033.410, subd. (a)), deposition testimony does not serve the same purpose as a request for admission, which is aimed primarily "at setting at rest a triable issue so that it will not have to be tried." (*Kelly*, at p. 673.) Accordingly, "[i]t is a misuse of a motion *in limine*" to attempt to compel a witness or a party to conform his or her trial testimony to his or her deposition testimony. Trial testimony may be impeached by inconsistent deposition testimony, but absent an abuse of the discovery process, such testimony should not be precluded. (*Id.* at p. 672.)

Ersoff also argues that the testimony of the M&A attorneys should have been excluded under Evidence Code section 352 because it would, and did, lead to a virtual minitrial as to each attorney's assessment of the hours worked. The court determined that such a "mini-trial" was especially appropriate in this case in which a jury was asked to decide the number of hours each attorney spent on the case and whether that number of hours was reasonable. That determination was well within the court's discretion. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1] [trial court's ruling excluding evidence under Evid. Code, § 352, reviewed for abuse of discretion, may be reversed only when it is shown the ruling was " 'arbitrary, capricious or patently absurd' " resulting in " 'a manifest miscarriage of justice' "]; *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 132–133 [211 Cal.Rptr. 356, 695 P.2d 653].)

c. *The court did not abuse its discretion in denying Ersoff's motion to exclude expert testimony on the reasonableness of the hours expended*

Ersoff also contends the court erred in denying his motion in limine to exclude Hobart's expert testimony that the number of hours M&A claimed to have spent on the case was reasonable. He asserts Hobart's testimony was inadmissible because it was grounded in speculative testimony about the hours worked and did not assist the jury in its fact finding process. (See Evid. Code, § 801, subd. (a) [expert testimony authorized when subject is sufficiently beyond common experience that opinion of expert would assist trier of fact]; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1299 [283 Cal.Rptr. 382, 812 P.2d 563].)

█ It is well settled that a contingency fee lawyer discharged prior to settlement may recover in quantum meruit for the reasonable value of services rendered up to the time of discharge. (*Fracasse v. Brent* (1972) 6 Cal.3d 784, 791 [100 Cal.Rptr. 385, 494 P.2d 9].) "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed." (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 433 [76 L.Ed.2d 40, 103 S.Ct. 1933].) However, providing evidence as to the number of hours worked and rates claimed is not the end of the analysis in such a quantum meruit action. The party seeking fees must also show the total fees incurred were reasonable. Factors relevant to that determination include "[t]he nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure of the attorney's efforts, the attorney's skill and learning, including his [or her] age and experience in the particular type of work demanded." (*Los Angeles v. Los Angeles Inyo-Farms Co.* (1933) 134 Cal.App. 268, 276 [25 P.2d 224], cited with approval in *Fracasse*, at p. 791; see also *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 [95 Cal.Rptr.2d 198, 997 P.2d 511] [citing same factors in considering whether fees to the prevailing party under Civ. Code, § 1717 were reasonable].) Because evidence and analysis of all these factors can be a "formidable undertaking" (*Cazares v. Saenz* (1989) 208 Cal.App.3d 279, 287–288 [256 Cal.Rptr. 209]), expert testimony in a quantum meruit action for attorney fees is appropriate to assist the fact finder. (*Matthiesen v. Smith* (1936) 16 Cal.App.2d 479, 481 [60 P.2d 873].)

The trial court's determination that Hobart's testimony would assist the trier of fact in this action was, therefore, well within its discretion. (*People v. McAlpin, supra,* 53 Cal.3d at p. 1299 [trial court's decision to admit expert testimony " 'will not be disturbed on appeal unless a manifest abuse of discretion is shown' "].) Hobart opined on the inherent differences in approach between contingency fee lawyers and hourly lawyers. He explained (contrary to the testimony provided by Ersoff's expert) the case involved much more work than the work product reflected in the file, provided some insight as to the complexity of the issues involved and concluded, based on his review of the file in the underlying case and in this case that, in light of the value of the settlement and the handful of hours that had elapsed between M&A's termination and the settlement of the case, 3,700 hours[6] was unquestionably reasonable. Hobart's testimony was plainly relevant and likely to assist the jury in evaluating all the factors related to the issue of reasonableness. Ersoff's objection to it, both here and in the trial court, and his contention Hobart's conclusions are "preposterous" and unbelievable when compared to Weil's testimony that the total case should have taken only 200 hours, relate to Hobart's credibility as an expert and the appropriate weight to be given to the opinion he provided, matters properly resolved by the jury, not an appellate court. (*Williams v. Volkswagenwerk Aktiengesellschaft* (1986) 180 Cal.App.3d 1244, 1265 [226 Cal.Rptr. 306] ["credibility of expert witnesses is a matter for the jury . . ."].)

2. *Substantial Evidence Supports the Jury's Verdict as to the Number of Hours Expended*

Although Ersoff frames his argument on appeal as a challenge to the trial court's rulings on the motions in limine, his appellate brief cites to testimony actually provided during phase two of the trial. In effect, Ersoff's challenge to the in limine rulings "is really one of insufficient evidence to support the court's judgment. As such, it fails since all hours allegedly worked by counsel for which no time records were available were attested to by the attorneys under oath. The problem then becomes one of fact finding" (*Margolin v. Regional Planning Com.* (1982) 134 Cal.App.3d 999, 1006–1007 [185 Cal.Rptr. 145] [considering reasonable attorney fee award under private attorney general statute, Code Civ. Proc., § 1021.5]) and accordingly, for this reviewing court, whether the fact finder's conclusions are supported by substantial evidence.[7]

---

[6] Although the estimates of the M&A attorneys totaled approximately 3,800 hours, 3,700 hours was the number assumed by Hobart in reaching his conclusions.

[7] In resolving challenges to a verdict based on sufficiency of the evidence, we review the record as a whole, resolving all conflicts and indulging all legitimate and reasonable inferences in favor of the prevailing part, to determine whether substantial evidence supports the verdict. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d

Although Ersoff suggests the attorneys' time estimates amounted to nothing more than guesses without any present recollection by the M&A attorneys of the hours spent, the record shows otherwise. Each of the M&A attorneys who worked on Ersoff's case testified in detail as to the work he or she had performed for Ersoff. Although the attorneys explained they could not remember six years after the fact the amount of time spent on each item for which they had labored on Ersoff's behalf, the attorneys explained they remembered the amount of work accomplished during the period and could provide fair weekly estimates of their time by recalling the percentage of their work week spent on Ersoff's case. Each provided specific testimony on the work he or she performed individually for Ersoff, discussed the complexity of the issues in a multimillion dollar case and explained the obstacles faced and the hours spent in preparing the matter for trial. Ersoff's counsel vigorously cross-examined each witness as to the items he or she had worked on and argued to the jury the estimates were inexact and totally disproportionate to the amount of work product created for the case. Expert witnesses on both sides testified concerning the reasonableness of the time spent in light of the nature of the case and the complexity of the issues presented. There was also evidence presented to the jury that the law firm that replaced M&A itself spent a total of 400 to 500 hours in the nine days leading up to the mediation simply to become familiar with the issues in the case—that is, without performing any additional work. The jury found that M&A did spend a great deal of time on the case—2,392 hours—albeit far less (less than two-thirds) than the approximately 3,800 hours testified to by the M&A attorneys. Based on the testimony at trial, the jury's verdict is amply supported by substantial evidence.[8]

---

139, 888 P.2d 1268].) "Substantial evidence" in this regard does not mean "any evidence." Rather, to be "substantial," the evidence must be " 'of ponderable legal significance, . . . reasonable in nature, credible, and of solid value.' " (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873 [197 Cal.Rptr. 925], italics omitted.) If there is substantial evidence, contradicted or uncontradicted, that will support the finding, it must be upheld regardless of whether the evidence is subject to more than one interpretation. (*Western States Petroleum Assn.*, at p. 571 [" 'When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court' "]; *Von Beltz v. Stuntman, Inc.* (1989) 207 Cal.App.3d 1467, 1481 [255 Cal.Rptr. 755] [reviewing court may not reweigh the evidence].)

[8] Ersoff also suggests in a single sentence on page 42 of his appellate brief the court erred in denying his motion for a nonsuit on the ground that there was no admissible evidence to support the necessary element of damages. However, as we explained, there was admissible evidence to establish the fact of damage. The only question for the jury, and one not properly resolved in a motion for nonsuit or a directed verdict, related to the *amount* of damage. Because Ersoff's motion for a nonsuit was without merit, it was properly denied. (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84] ["A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor"].)

### 3. *Neither the Challenged Jury Instruction Nor the Special Verdict Was Improper*

#### a. *The challenged jury instruction*

The jury was instructed, "The plaintiff law firm was not required to maintain time records, nor to bill the client monthly or at all for the legal services rendered to defendant Seth Ersoff." Ersoff contends, even if evidence of billing records is not required to support a claim for attorney fees, Business and Professions Code section 6148, subdivision (b), mandates they be maintained. He insists the instruction suggesting otherwise was erroneous.

█ As Ersoff contends, Business and Professions Code section 6148, subdivision (b), provides, "All bills rendered by an attorney to a client shall clearly state the basis thereof. Bills for the fee portion of the bill shall include the amount, rate, basis for calculation, or other method of determination of the attorney's fees and costs." However, subdivision (a) of section 6148, which Ersoff fails to cite, states its provisions do not apply to any case coming within Business and Professions Code section 6147, pertaining to contingency fee agreements. Section 6147, in turn, requires a statement of the contingency fee rate, but does not require contingency fee lawyers to maintain billing records.[9] In addition, Ersoff's argument omits reference to subdivision (c) of section 6148, which makes clear that, even when the section applies and has been violated, an attorney is still "entitled to collect a reasonable fee." (See Bus. & Prof. Code, § 6148, subds. (b), (c); see also *Flannery v. Prentice* (2001) 26 Cal.4th 572, 579 [110 Cal.Rptr.2d 809, 28 P.3d

---

[9] Business and Professions Code section 6147, subdivision (a), provides, "An attorney who contracts to represent a client on a contingency fee basis shall, at the time the contract is entered into, provide a duplicate copy of the contract, signed by both the attorney and the client, or the client's guardian or representative, to the plaintiff, or to the client's guardian or representative. The contract shall be in writing and shall include, but is not limited to, all of the following: [¶] (1) A statement of the contingency fee rate that the client and attorney have agreed upon. [¶] (2) A statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the claim will affect the contingency fee and the client's recovery. [¶] (3) A statement as to what extent, if any, the client could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract. This may include any amounts collected for the plaintiff by the attorney. [¶] (4) Unless the claim is subject to the provisions of Section 6146, a statement that the fee is not set by law but is negotiable between attorney and client. [¶] (5) If the claim is subject to the provisions of Section 6146, a statement that the rates set forth in that section are the maximum limits for the contingency fee agreement, and that the attorney and client may negotiate a lower rate."

860] [when Bus. & Prof. Code, § 6148, subd. (b), is violated, attorney still entitled to collect reasonable fee as provided in subdivision (c) of that section].)[10]

We find no error in the instruction given to the jury. Nor, in light of M&A's entitlement to "a reasonable fee" notwithstanding any violation of Business and Professions Code section 6148, subdivision (a) (see Bus. & Prof. Code, § 6148, subd. (c)), has Ersoff demonstrated the instruction was prejudicial. (Code Civ. Proc., § 475 [no judgment decision or decree shall be reversed absent showing error prejudicial]; *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163]; *City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 51–52 [115 Cal.Rptr.2d 151] [prejudice will not be presumed; burden rests with party claiming error to demonstrate not only error, but also a resulting miscarriage of justice].) In any event, Ersoff's failure to object to the instruction results in a forfeiture of the challenge to the instruction on appeal. (*Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 [28 Cal.Rptr.2d 133] [when trial court gives jury instruction that "is correct as far as it goes but which [appellant argues] is too general or is incomplete for the state of the evidence, a failure to request an additional or a qualifying instruction will waive a party's right to later complain on appeal about the instruction which was given"]; *Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 333–334 [5 Cal.Rptr.2d 594].)[11]

### b. *Special verdict form*

The special verdict form submitted to the jury inquired whether M&A was entitled to damages, whether the lawyers reasonably spent time to provide legal services to Ersoff and, if so, the number of hours each attorney reasonably spent working on Ersoff's case. Ersoff asserts the form was misleading and incomplete because it did not identify a beginning and ending date for the time spent on Ersoff's case.

---

[10] Similarly, when a contingency fee lawyer violates the requirements for a contingency fee agreement set forth in Business and Professions Code section 6147, subdivision (a), Business and Professions Code section 6147, subdivision (b), provides, "Failure to comply with any provision of this section renders the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee."

[11] Ersoff also asserts the trial court improperly instructed the jury, "the court has determined that Seth Ersoff must pay Mardirossian & Associates, Inc., for the reasonable value of legal services" thereby depriving Ersoff of his affirmative defenses of waiver and estoppel or implying to the jury it had no choice but to find in favor of M&A. We do not consider the argument because, although that instruction was among those proffered by M&A in its proposed jury instructions, the trial court sustained Ersoff's objection to that instruction and did not include it among the instructions actually given to the jury.

Although Ersoff objected at trial to the special verdict form, he did so only on the ground it should have included the question whether M&A had "proved the number of hours" it spent on Ersoff's case. He did not challenge the special verdict form for omitting the period M&A represented him nor did he include in his own proposed special verdict form the temporal inquiry he now says was unfairly omitted. Because Ersoff did not challenge the special verdict form on this ground below, we do not consider it for the first time on appeal. (See *Jones v. Wagner* (2001) 90 Cal.App.4th 466, 481 [108 Cal.Rptr.2d 669] [" '[A]s a general rule issues not raised in the trial court cannot be raised for the first time on appeal.' "]; see also *Lynch v. Birdwell* (1955) 44 Cal.2d 839, 851 [285 P.2d 919] [where defendants did not object at trial to error in verdict form, "it appears to be the settled rule that they have waived [their] right to complain as to its form"]; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 [41 Cal.Rptr.2d 295] ["BMW waived any objection to the special verdict form by failing to object before the court discharged the jury"].)

### 4. *The Trial Court Did Not Err in Awarding Prejudgment Interest**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### 5. *The Trial Court Did Not Commit Prejudicial Error in Phase One When It Found M&A Was Not Prohibited from Recovering Fees in Quantum Meruit*

■ Rule 3-310(C) prohibits an attorney from simultaneously representing more than one client in a matter in which the interests of the clients potentially or actually conflict in the absence of the clients' informed written consent.[12] Ersoff contends M&A violated rule 3-310 when it simultaneously represented Ersoff and Leonard in their action against UMSI and Monea. According to Ersoff, a conflict existed at the inception of the dual representation because Ersoff had signed Leonard's name to the testimonial release authorizing UMSI's use of Leonard's testimonial for the infomercial, but Ersoff and Leonard apparently claimed in the litigation that Ersoff did not have the authority to sign Leonard's name. Also, Leonard sought (albeit unsuccessfully) a temporary restraining order that, if granted, would have interfered with Ersoff's interest in having the infomercial broadcast. As a

---

*See footnote, *ante*, page 257.

[12] Rule 3-310(C) provides, "A member shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict." Rule 3-310(A)(2) defines "informed written consent" as the client's or former client's "written agreement to the representation following written disclosure."

result of these "egregious conflicts" and the failure to obtain sufficient informed consent, Ersoff argues the trial court erred in ruling M&A had not forfeited its right to recover attorney fees.

■ In certain circumstances, a violation of the Rules of Professional Conduct may result in a forfeiture of an attorney's right to fees. (See *Huskinson & Brown v. Wolf, supra,* 32 Cal.4th at p. 463 [when attorney violates rule of professional conduct by engaging in simultaneously conflicting representation without sufficient informed consent, quantum meruit recovery to collect fees may be prohibited]; see also *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 14, fn. 2 [60 Cal.Rptr.2d 207] ["The rule that an attorney who engages in conflicting representation without obtaining informed consent is not entitled to compensation is not based on the premise that the attorney must pay a penalty so much as the principle that 'payment is not due for services not properly performed' "].) Although the breach of a rule of professional conduct may warrant a forfeiture of fees, forfeiture is not automatic but depends on the egregiousness of the violation. (*Pringle v. La Chapelle* (1999) 73 Cal.App.4th 1000, 1005–1006 [87 Cal.Rptr.2d 90] [neither the Bus. & Prof. Code nor the Rules of Prof. Conduct provide for deprivation of fees whenever rule of professional conduct is violated; whether forfeiture of the right to collect fees is required depends on the egregious nature of the violation].)

We review the trial court's determination as to the existence of an actual or potential conflict and whether such conflicts are sufficiently egregious to require forfeiture of fees for abuse of discretion and the court's factual findings in that context for substantial evidence. (*Sullivan v. Dorsa* (2005) 128 Cal.App.4th 947, 965–966 [27 Cal.Rptr.3d 547] ["[T]he owners fail to show that any violation of the rules governing representation of adverse interests was *serious* enough to *compel* a forfeiture of fees. Insofar as these questions were entrusted either to the trial court's discretion or its factfinding powers, we cannot substitute our judgment for the trial court's except on a clear showing that those powers were abused"].)

In the instant case, after hearing extensive testimony and finding Leonard's objective was not to prohibit the use of his image but to be paid for it and to assist Ersoff's own action, the trial court concluded that, at most, a potential conflict of interest existed between the two men. It concluded the written consent informing Ersoff a conflict might exist, in which Ersoff expressly acknowledged the opportunity to consult outside counsel concerning the issue, was sufficient to comply with rule 3-310. In any event, the court ruled, any violation of rule 3-310 was not sufficiently egregious under the circumstance to justify a total forfeiture of fees. The court rejected Ersoff's analysis, namely, that as the person who signed Leonard's name to the release, there

existed at the inception of the litigation an actual conflict of interest between Leonard and Ersoff, finding Ersoff had withheld this information from his attorney. The court explained, "If I were to excuse the requirement that Mr. Ersoff pay, I would be rewarding Mr. Ersoff for hiding conflicting information from his attorney. And it would be, I believe, a bizarre result." The court further concluded that, in light of M&A's work on Ersoff's behalf up until the mediation, "there would be an unjust enrichment of Mr. Ersoff if I would excuse the payment of attorney's fees."

Ersoff does not challenge these factual findings on substantial evidence grounds. Instead, he asserts that rule 3-310 was violated because, even if the conflict were potential rather than actual, the written consent did not detail the conflicts at issue. As a result, he asserts, the consent is inadequate and M&A should be denied any fees. Yet, the adequacy of the written disclosure and consent is not dispositive. As the court observed, even if rule 3-310 were violated in this instance, Ersoff has not shown the violation was particularly egregious or that he was in any way prejudiced by it. Under the circumstances, we cannot say the trial court abused its discretion in concluding it would be inequitable and an "an unjust enrichment" if Ersoff's attorney fee obligation were to be excused. (See *Sullivan v. Dorsa, supra,* 128 Cal.App.4th at p. 966; *Pringle v. La Chapelle, supra,* 73 Cal.App.4th at pp. 1005–1006 [where attorney represented corporation and employee in sexual harassment case in violation of rule 3-310, client failed to show how conflict of interest was sufficiently egregious to justify forfeiture of earned fees]; see also *Cal Pak Delivery, Inc. v. United Parcel Service, Inc., supra,* 52 Cal.App.4th at p. 16 [acknowledging quantum meruit recovery may be proper despite attorney's violation of ethical rule "on an unjust enrichment theory where the client's recovery was a direct result of the attorney's services"].)[13]

6. *The Trial Court Did Not Err in Denying the Motion To Dismiss and Imposing Sanctions*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[13] Ersoff also contends, for the first time on appeal, that an actual conflict with Leonard existed because he and Leonard had an undisclosed oral agreement that Ersoff would recover a percentage of any royalties Leonard was awarded in the action. Ersoff did not raise that contention during phase one of the trial, the trial court did not consider it and we decline to pass on that question in the first instance. (*Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3 [72 Cal.Rptr.2d 232] ["It is axiomatic that arguments not asserted below are waived and will not be considered for the first time on appeal"]; *Martinez v. Scott Specialty Gases, Inc.* (2000) 83 Cal.App.4th 1236, 1244 [100 Cal.Rptr.2d 403].)

*See footnote, *ante,* page 257.

## DISPOSITION[19]

The judgment is affirmed. M&A is to recover its costs on appeal.

Johnson J., and Zelon, J., concurred.

The petition of appellant Seth Ersoff for review by the Supreme Court was denied October 10, 2007, S155663.

---

[19] In light of our affirmance of the judgment, we do not consider the arguments raised by M&A in its protective cross-appeal.