Filed 6/10/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ANDREW TAYLOR et al., | B296537 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. TC028803) |
| v. | |
| COUNTY OF LOS ANGELES et al., | |
| Defendants; | |
| MICHAEL S. TRAYLOR, | |
| Claimant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge.  Affirmed.

Michael S. Traylor, in pro. per., for Claimant and Appellant.

The Sweeney Firm, John E. Sweeney; Glickman & Glickman and Steven C. Glickman for Plaintiffs and Respondents.

No appearance for Defendants.

————————————

Attorney Michael S. Traylor represented a grieving family for a month. Then they fired him. The family's new lawyers asked Traylor for his case files. Traylor refused. He provided the family no benefit. Yet he demanded $308,000 in attorney fees. The court correctly awarded less.

We publish to underline that contemporaneous time records are the best evidence of lawyers' hourly work. They are not indispensable, but they eclipse other proofs. Lawyers know this better than anyone. They might heed what they know.

I

The case stems from the 2016 police shooting of Donta Taylor. Donta Taylor's family—his father Andrew Taylor, Donta Taylor's fiancée Sherron Oliver, and Oliver's children—sued Los Angeles County and the sheriff's department for wrongful death and civil rights violations. We call these plaintiffs Taylor unless context is to the contrary.

For this appeal, the key years are 2016, 2018, and 2019.

In September *2016*, shortly after the shooting, Traylor briefly represented Taylor. But Taylor soon replaced Traylor with lawyer John Sweeney. Steven Glickman and Glickman & Glickman later joined Sweeney. These new lawyers asked Traylor for his case files. If Traylor had any files, he never turned them over. He never explained why. Traylor did no work on the case after October 5, *2016*.

Sweeney and Glickman filed suit in April 2017 and settled the case in November 2018 for $7 million. Traylor filed an attorney's lien notice.

In October *2018*, Traylor gave Sweeney two invoices, one for Taylor and one for Oliver, for his 2016 work on the case. Both invoices misspelled Donta Taylor's name. The invoices were

2

internally contradictory.  To two decimal points, they simultaneously and contradictorily claimed Traylor's total hours as both 130.00 and 180.00 hours.  Each has a one-line entry for "legal research and investigation."  There was no itemization.

In January *2019*, after repeated requests to show his work, Traylor eventually submitted an invoice along with a newly-revealed three-page itemization.  To one decimal point, this document claimed a total of 200.0 hours of work.  The document made no effort to square the 200.0 figure with the earlier hourly sums of 130.00 and 180.00.  This triple contradiction remained.

Taylor and Traylor both asked the trial court to decide the lien issue.  Traylor demanded $308,000.  Taylor, by contrast, maintained Traylor was entitled at most to $4,554.  Taylor argued Traylor deserved credit for fewer than 10 hours of client management work because Traylor had refused to turn over his files and had provided no client value.

Taylor noted inconsistencies in the hours Traylor claimed.  Declarations from Taylor and Oliver portrayed Traylor as a lawyer who got himself hired at a time of overwhelming grief, who provided no counsel, who did no work, and who literally went fishing during the short-lived retention.

The court held a hearing on March 14, 2019.  Traylor hired no court reporter.  The trial court found jurisdiction to adjudicate Traylor's lien, granted the lien in the amount of $17,325, and struck the rest.  The minute order provides no other information.

II

We presume an attorney fee award is correct unless the appellant demonstrates the trial court abused its discretion. (*Rhule v. WaveFront Technology, Inc.* (2017) 8 Cal.App.5th 1223,

1229 (*Rhule*).) Traylor claims the court erred in many ways. His unavailing arguments are as follows.

A

Traylor contends it was an abuse of discretion for the trial court to refuse to apply the written terms of his retainer agreements. We cannot say, based on the record Traylor gives us, the court did any such thing. Rather, it appears the trial court properly judged Traylor's evidence to be weak and discounted it appropriately.

Traylor points to the termination provision of his retainer agreements with Taylor and Oliver. Each matching retainer agreement had two ways of calculating what the client owed Traylor if the client replaced Traylor with new lawyers. The provisions obligated the client to pay the greater of the following:

(a) the value of Traylor's time spent on the case at $475 per hour; or

(b) a portion of the gross recovery determined by a percentage multiplied by the ratio of Traylor's hours to the total hours spent by all counsel.

Both methods required Traylor to quantify his time on the case. But Traylor never supplied reliable quantification.

Traylor did make claims about his hours on the case, but his claims were delayed and contradictory.

Traylor's claims were delayed. Traylor claimed he had worked from September 2, 2016 to October 5, 2016 and had done nothing after *2016*. Two years later, on October 15, *2018*, Traylor sent Sweeney two invoices—one for Andrew Taylor and one for Sherron Oliver—with specific hourly totals. In January *2019*, Traylor produced a different invoice with different figures, accompanied by a three-page billing record.

4

Traylor's claims were contradictory, and in many different ways.

Traylor's 2018 invoice to Andrew Taylor contradicted itself. The invoice listed "52.5 hours of legal research and investigation re: Dontay Taylor" under the column heading "ACTIVITY." On the same page, on the same line, under the heading "QTY" in the column immediately to the right, Traylor wrote "102.50." The same line of the same page of this 2018 invoice thus simultaneously and inconsistently claimed "52.5" hours and "102.50" hours for the 2016 work.

Many aspects of Traylor's billing statements are unsettling. We begin with the 2018 discrepancy between 52.5 and 102.50 hours.

First, this discrepancy is large. 102.50 is almost, but not quite, twice as large as 52.5. That degree of imprecision is considerable.

Second, the claimed *level of accuracy* is inconsistent: "52.5" hours claims accuracy to one decimal point; "102.50" hours claims accuracy to two decimal points. The former implies recordkeeping accurate to six-minute intervals. The latter implies recordkeeping accurate to .6-minute intervals, which are units of 36 seconds. This inconsistency might be minor had Traylor explained his method of keeping records, but he never has. This absence of explanation leaves one grasping for clues, and the clues magnify the doubt.

Third, the large simultaneous discrepancy is unexplained. In his papers to us, Traylor never mentions or reconciles the discrepancy between 52.5 versus 102.50 hours.

There is a fourth alert as well. We have been discussing Traylor's October 15, 2018 invoice to Andrew Taylor. That same

5

day, in the same communication, Traylor revealed another invoice to Sherron Oliver. This invoice, under the "QTY" column, claimed "77.50" hours of work for Oliver. Adding 77.50 to 52.5 equals 130.0 hours. Alternatively, adding 77.50 to 102.50 equals 180.00 hours. Both 130.0 and 180.00 are round numbers. Curiously round, one might say.

There is a fifth red flag. After a delay, Traylor submitted a three-page billing record dated January 14, *2019*. These three pages list 50 tasks, ranging from .1 hours to 8.7 hours each. Two pages list entries for "TAYLOR/OLIVER" and total 133.8 hours. The other page lists entries for "OLIVER" and totals 66.2 hours. Adding 133.8 and 66.2 totals 200.0 hours.

So by 2019, Traylor had three different claims about his 2016 time on this case: 130.0, 180.00, and (after he heard about the $7 million settlement) 200.0 hours. Traylor has not explained this triple inconsistency.

There is a sixth problem. 200.0 is another round number. The sequence of 130.0, 180.00, and 200.0 hours is a sequence of three round numbers. That could be merely a curious coincidence. Or it could create an inference of reverse engineering: the author chose a target in round numbers, and then came up with detailed inputs to sum to the target. We indulge reasonable inferences in support of the trial court's ruling. This inference of reverse engineering is reasonable.

There is a seventh difficulty. The January 14, *2019* billing itemization concerns daily events in *2016*: to be precise, from September 2, 2016 to October 5, 2016. More than two years elapsed between the supposed events in 2016 and the recordkeeping in 2019. Traylor never claimed the itemization he revealed in 2019 was a record he created contemporaneously in

2016. This claim would be implausible, given Traylor's 2018 report that his hourly total from 2016 was either 130 or 180 (but not 200) hours. The reasonable inference is Traylor's itemization was not contemporaneous recordkeeping but a time reconstruction after a delay of years.

For these seven reasons, the trial court would have been entitled to reject Traylor's hourly claims as unworthy of belief.

Yet the court did not entirely reject Traylor's claim and award him nothing. Nor did the court take Sweeney and Glickman's proposal, which would have yielded an award of less than $5,000. Rather, the court did its best to estimate a reasonable award for Traylor. The sum was $17,325, which is supportable under part (a) of the termination provision of his retainer agreements. This method implies the court estimated Traylor's hourly total at about 36 hours. That estimate was generous to Traylor and nothing he can protest.

As for part (b) of the termination provision, Traylor did not field all the data needed to compute fees under this provision. We lack the total hours Sweeney, Glickman, and their firms devoted to the case. We know from declarations they and their associates worked *at least* 1,650 hours. But the declarations do not identify the total hours worked by all of Taylor's lawyers. Nor, as discussed above, did Traylor reliably quantify his own hours.

The $17,325 award was reasonable. Three factors drive our conclusion.

First, Traylor never hired a court reporter, so we have no record of the hearing. Traylor's decision means he lacks a basis for identifying and attacking the court's specific calculation method, which we presume was correct. (See *Rhule*, *supra*, 8

Cal.App.5th at pp. 1227–1229; cf. *Southern California Gas Co. v. Flannery* (2016) 5 Cal.App.5th 476, 487 [without a reporter's transcript, defendant could not demonstrate the size of a fee award was an abuse of discretion].)

Second, Traylor never gave his case files to Sweeney, Glickman, Taylor, or Oliver. Traylor's inaction was unexplained and improper. (Cf. Rules Prof. Conduct, rule 1.16(e)(1) [upon termination and at client's request, lawyers promptly shall release all client materials and property]; *Kallen v. Delug* (1984) 157 Cal.App.3d 940, 950 [lawyer must release client's case files after discharge because lawyer's work product belongs to client].) This inaction created the inference Traylor had no case files and did no work—at least, no work of use to anyone.

Third, Traylor never explained the discrepancies in his supposed recordkeeping. Unexplained discrepancies entitle a fact finder entirely to reject a witness's evidence as unreliable. (Cf. CACI No. 5003 [once you decide a witness was untruthful about something important, you may disbelieve that witness entirely].)

Given these three factors, the court's decision to give something rather than nothing to Traylor was a discretionary act of grace. There was no error.

B

Traylor contends the trial court abused its discretion by rejecting the holding in *Mardirossian & Associates, Inc. v. Ersoff* (2007) 153 Cal.App.4th 257, 269 (*Mardirossian*). The trial court did not reject this holding, which was that a trial court properly denied a motion to prohibit attorneys from testifying about the hours they spent on a case. (*Ibid.*) The *Mardirossian* decision's evidentiary holding was entirely correct: the Evidence Code does not bar lawyers from testifying from personal knowledge about

8

what they have done.  (*Ibid*.)  Here the issue is different:  the propriety of the fact finder's credibility call.  The trial court was fully entitled to discount Traylor's testimony.

*Mardirossian* concerned the admissibility and not the weight of evidence.  (*Mardirossian*, *supra*, 153 Cal.App.4th at p. 265.)  A client named Ersoff discharged his lawyers and sought to pay them nothing for their work.  (*Id*. at p. 263.)  The trial court set a jury trial to determine the hours the lawyers had worked on the matter and whether that number of hours was reasonable.  (*Id*. at p. 264.)  Before trial, Ersoff moved in limine under Evidence Code sections 350 and 352 to bar each lawyer's testimony.  (*Mardirossian*, *supra*, 153 Cal.App.4th at p. 265.)  Ersoff argued the deposition testimony showed the contingency-fee lawyers had kept no time-records memorializing time spent on a case.  (*Ibid*.)  Ersoff claimed this meant their testimony necessarily would be "'incompetent and insufficient,'" because their estimates were "false and absurd" and admission of the testimony would be unduly burdensome.  (*Ibid*.)  The trial court rejected this motion in limine.  (*Ibid*.)  The Court of Appeal affirmed on unimpeachable logic:  the lawyers proposed to testify from personal knowledge; their testimony was relevant and had a proper foundation; and the trial court's decisionmaking about Evidence Code section 352 had been well within its sound discretion.  (*Mardirossian*, *supra*, 153 Cal.App.4th at p. 269.)

In the course of this ruling, the *Mardirossian* court stated that, "[c]ontrary to Ersoff's contention, there is no legal requirement that an attorney supply billing statements to support a claim for attorney fees."  (*Mardirossian*, *supra*, 153 Cal.App.4th at p. 269.)  We completely agree.  But it is incorrect to conclude from this ruling, as Traylor has, that a fact finder

9

may not consider the absence of contemporaneous time records when evaluating lawyers' evidence. At oral argument, Traylor summarized his misreading of *Mardirossian* by saying the case "lowered the bar" for fee requests. It did not.

Whether evidence is admissible is different than whether it is good. For instance, my eyewitness account of a car crash I saw years ago may be admissible if it is relevant and based on my personal knowledge. But admissibility does not imply my testimony is reliable. It might be pathetically weak.

Admissible evidence may be weak for many different reasons. The four usual weaknesses of witness testimony are the risk of *insincerity*, the risk of impaired *perception*, the risk of *memory* defects, and the risk of faulty *narration*. (E.g., Sklansky, *Hearsay's Last Hurrah*, 2009 Sup. Ct. Rev. 1, 15–16.) For example, my testimony about the car crash might be *insincere* because, as a party to the case, I am biased. My *perception* might have been impaired because I was texting and oblivious to all else. My *memory* may be defective after the passage of time. And my courtroom *narration* may be faulty if public speaking ties my tongue.

Fact finders can give different weights to different kinds of evidence. Suppose a nearby camera also captured the car crash. That evidence may also be admissible but far superior to my testimony. The camera's video can be unbiased, unblinking, unchanging, and clear. The single video can be worth a thousand of my poor words.

Both are admissible. One is weak. The other is worthy.

So too with evidence about time spent on a case.

Lawyers can testify from memory to the hours they devoted to a case. That testimony, based on personal knowledge, can be

relevant and admissible. But that evidence may be of poor quality. Witnesses can be prone to bias when their own paychecks are at stake. And every lawyer who has kept time sheets knows delays in recordkeeping diminish accuracy. If you are a *month* late, it is hard to reconstruct a bygone day in six-minute intervals. Now increase the delay to two *years*. Perform this thought experiment: what were you doing two years ago today, down to six-minute intervals? These two risks aggravate each other: unless you kept detailed contemporaneous records according to some reliable method, common experience will lead observers to regard your tardy and self-serving six-minute claims as largely fictional.

For this reason, wise lawyers keep accurate time records. (E.g., Tuft et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2019) ¶ 5:1049 ["Pinpointing 'billable hours' spent on a 'partially performed' case is essential to fixing the proper 'pro rata contract share' fraction. Thus, it behooves contingent fee attorneys to keep accurate *time records* for services rendered."].)

Contemporaneous time records surely are a bother to keep. But people paying those bills are entitled to care about accuracy. At hundreds of dollars an hour, minutes here and minutes there add up. Accuracy is a professional virtue and a systemic concern. The public is entitled to confidence the justice system is just as careful about getting legal bills right as it is about getting everything else right. And exact clocks and timekeeping software have made it rather easy to be accurate—extremely accurate.

So *Mardirossian* was obviously right to rule a lawyer could testify about time on a case without billing records. But it misunderstands *Mardirossian* to claim it as a reason for skipping

11

contemporaneous record keeping. You can take that chance if you dare. Perhaps you are confident no client will ever fire you. But if the unexpected happens, some fact finder may put you to your proof. In that situation, you will appreciate your contemporaneous time records.

The trial court in this case was entitled to discount Traylor's belated and contradictory claims about his time on the case. Its skepticism was proper under *Mardirossian*.

C

The other issues are insubstantial.

Traylor asserts the trial court improperly released Sweeney and Glickman's award of fees to them. Because his opening appellate brief provided no argument or authorities on this issue, Traylor forfeited it.

Traylor claims the trial court lacked jurisdiction to resolve his lien claim in the underlying case. Traylor never contested the trial court's authority until this appeal. Rather, Traylor filed ex parte and motion papers *asking* the court to resolve his lien claim. Traylor thus forfeited this objection. (See *Lovett v. Carrasco* (1998) 63 Cal.App.4th 48, 55.)

Traylor mentioned quantum meruit in one sentence of his opening brief but disclaimed this theory in his reply, stating "no such contention has been made."

## DISPOSITION

We affirm the trial court's order and direct Traylor to pay the respondents' costs.

WILEY, J.

We concur:

GRIMES, Acting P. J.

STRATTON, J.